City of New Bedford *v.* Massachusetts Commission Against Discrimination.

CITY OF NEW BEDFORD *vs.* MASSACHUSETTS COMMISSION
AGAINST DISCRIMINATION & another[1]
(and a companion case[2]).

Bristol. September 3, 2003. - December 2, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Arbitration,* Vacating award. *Anti-Discrimination Law,* Arbitration, Handicap.
*Massachusetts Commission Against Discrimination.*

This court concluded that G. L. c. 151B, § 6, rather than G. L. c. 251, § 11, provided the exclusive avenue for judicial review of an award made under the alternative dispute resolution program of the Massachusetts Commission Against Discrimination (MCAD), because a case proceeding to arbitration remains at all times within the MCAD's exclusive jurisdiction, subject to its review before any arbitration decision becomes "final"; therefore, a reviewing court should determine whether the MCAD complied with its own policy, applying the standards of G. L. c. 30A, § 14(7), rather than review the initial decision of the arbitrator itself. [458-461]

In an action for judicial review of a decision by the Massachusetts Commission Against Discrimination (MCAD) upholding an arbitrator's decision awarding a police officer back pay, emotional distress and punitive damages, and reinstatement to elite police teams based on handicap employment discrimination, this court concluded that the arbitrator's decision was palpably wrong and repugnant to the MCAD's purposes and policies, where the officer failed to make a threshold showing that he was "handicapped" within the meaning of G. L. c. 151B; even assuming that the officer's being "regarded as" having "emotional problems" and being "mentally unstable" satisfied the first step of establishing that he had a perceived "impairment," and that the "major life activity" at issue was "working," a perception that the officer was unable to perform only a particular aspect of a single, particular job was not sufficient to satisfy the "substantial limitation" requirement of G. L. c. 151B, § 1 (17); further, no evidence suggested that his superiors regarded him as substantially limited in his ability to think, concentrate, and interact with others, as compared to the ability of the average person in the general population. [461-468]

CIVIL ACTION commenced in the Superior Court Department on June 7, 2000.

[1]Henry S. Turgeon, Second.
[2]Henry S. Turgeon, Second *vs.* City of New Bedford & another.

A motion for confirmation of the arbitration award and a motion to dismiss were heard by *E. Susan Garsh*, J.

CIVIL ACTION commenced in the Superior Court Department on July 18, 2000.

Motions for judgment on the pleadings were heard by *Ernest B. Murphy*, J.

The Supreme Judicial Court on its own initiative transferred the cases from the Appeals Court.

*Donald J. Fleming* for Henry S. Turgeon, II.

*Jonathan M. Silverstein* (*Darren R. Klein* with him) for the plaintiff.

*Simone Liebman* for Massachusetts Commission Against Discrimination.

*John M. Collins* for Massachusetts Chiefs of Police Association, Inc., amicus curiae, submitted a brief.

MARSHALL, C.J. These appeals arise from an arbitrator's decision, subsequently affirmed by the Massachusetts Commission Against Discrimination (MCAD), holding the city of New Bedford (city) liable for handicap discrimination against one of its police officers, Henry S. Turgeon, II. The arbitration had proceeded as part of MCAD's alternative dispute resolution (ADR) program. While the MCAD's review of the arbitrator's award was pending, Turgeon filed a complaint in the Superior Court to confirm the award pursuant to G. L. c. 251. On the city's motion, a judge in the Superior Court dismissed the case. When the MCAD affirmed the arbitrator's award,[3] the city filed a separate action in the Superior Court, challenging MCAD's decision. See G. L. c. 151B, § 6. A second judge in the Superior Court affirmed the decision of the MCAD. Turgeon appealed from the judgment in the first action, and the city appealed from the judgment in the second action. A third Superior Court judge allowed Turgeon's motion to consolidate the cases; however, the cases continued to proceed separately. We transferred the appeals to this court on our own motion.

We affirm the judgment denying Turgeon's request for

---

[3]The MCAD affirmed the arbitrator's award on June 20, 2000, after Turgeon had filed his action in the Superior Court but before judgment had entered against him on August 10, 2000.

confirmation of the arbitrator's award under G. L. c. 251, on procedural grounds. Because we conclude that Turgeon has not made a threshold showing that he is "handicapped" as defined in G. L. c. 151B, § 1 (17), we reverse the judgment upholding the MCAD's affirmance of the arbitrator's award. We remand the matter to the Superior Court where judgment shall enter for the city.[4]

1. *Facts.* We summarize the facts as found by the arbitrator, supplemented where necessary by undisputed aspects of the record. On February 11, 1996, Turgeon, a New Bedford police officer and member of the New Bedford police department's (department's) "SWAT teams,"[5] shot and killed an armed suspect. Turgeon spent the ensuing twelve months on leave on "injured on duty" (IOD) status. During that period there were two separate inquiries concerning the circumstances of the shooting. First, a public inquest was conducted before a judge in the District Court. Second, the professional standards division of the department conducted an internal investigation. Both investigations vindicated Turgeon of any wrongdoing, and no criminal or other charges were brought against him. In the wake of those decisions, Turgeon returned to his regular police duties in February, 1997.

Shortly after Turgeon's return to active duty, then-acting Chief of Police Carl Moniz removed Turgeon from both SWAT teams on which he previously had served — the special reaction team (SRT) and the tactical patrol force (TPF). Moniz's decision is the focus of Turgeon's complaint of handicap discrimination. We describe in some detail the facts culminating in that decision.

Immediately after the 1996 fatal shooting incident, Turgeon was placed on leave on IOD status and referred to a counsellor,

---

[4] We acknowledge the amicus brief filed by The Massachusetts Chiefs of Police Association, Inc.

[5] "SWAT team" is a generic name for teams of police officers trained to respond to especially dangerous situations. Turgeon was a member of the department's special reaction team (SRT), as well as its tactical patrol force (TPF). The SRT engages in extremely high-risk operations such as those involving hostages, barricaded subjects, or drug raids. The TFP is deployed in other potentially dangerous situations such as those requiring crowd or special event control, "VIP protection," or riot control.

in accordance with department policy. Approximately one month later, Turgeon obtained the necessary medical release to return to active duty. Because the public inquest and the internal investigation were still under way, the department assigned Turgeon to an administrative (desk) position. Turgeon responded by "call[ing] in sick." After negotiations with the department, Turgeon returned to IOD status. For the following eleven months, and while he was IOD, Turgeon periodically consulted a psychologist.

In February, 1997, at the conclusion of the two investigations, an incident occurred that is of some significance. On January 25, 1997, apparently when he learned the outcome of the internal investigation absolving him of any wrongdoing, Turgeon sent an electronic mail message (e-mail) to every member of the police department. As the arbitrator found, the lengthy, accusatory message showed "very clearly" Turgeon's "feelings" toward the department's senior officials. Specifically, Turgeon criticized unnamed leaders of the police department for what he claimed was their failure to support him in the wake of the shooting. He informed his fellow officers that he had lost "respect and admiration" for his superiors, advising his colleagues that, if they were involved in a fatal shooting, they would receive no departmental support. Turgeon urged that his colleagues "not think twice" in a situation similar to the one he confronted, and to protect themselves "however . . . possible." While he remained loyal to his "profession," Turgeon wrote, he did not remain loyal to "this [d]epartment." It is a fair reading of Turgeon's e-mail that he was angry and bitter about the treatment he had received while he awaited the outcome of the public and internal investigations.

Turgeon returned to active duty on February 16, 1997, and was assigned to a one-man car patrol. On inquiry, the SRT commander, Lieutenant Kenneth Gifford, informed Turgeon that he would return as a member of the SRT team, and issued a new holster to him. This was followed by a second incident also of import to this case.

Gifford ordered Turgeon to undergo an SRT requalification firing examination. Turgeon reported to the firing range, but complained to the officer in charge, saying, according to the of-

ficer's testimony, that he "didn't know why he had to be there because he proved himself he could shoot." Turgeon later sought to downplay the import of this remark.[6] The officer, however, was left with the impression that Turgeon had made an inappropriate reference to the shooting incident in which Turgeon had killed a man.

A few days later, members of the SRT (including its two leaders) discussed, among other things, Turgeon's return to their team. As the arbitrator found, the team regularly discussed prospective team members; their discussion of Turgeon was not out of the ordinary.[7] Noting both Turgeon's e-mail and the incident at the firing range, the team members were "concerned" about Turgeon, and not "comfortable" about his return to the SRT. One team leader expressed his concerns as a "leader of men whose lives were on the line in going through the door in a hostage or barricade situation."[8] The two leaders presented these concerns to their commander, Gifford, informing him that Turgeon was "acting different," seemed to be "under stress," was "taking chances," and seemed to be "trying to prove something."

In response, Gifford undertook his own investigation, talking to officers who were friends of Turgeon, including his partner on the night of the shooting. The full content of these conversations is not contained in the record, but it is not disputed that

---

[6]Turgeon testified that he and other officers had been shooting at cans while they waited to take the firing test. Turgeon testified that, on the day in question, he had said he did not see "why he had to qualify like this, he had just shown when they were shooting at cans that he could." The officer in charge testified that he did not recall anyone shooting at cans before the firing test began. No one confirmed Turgeon's account.

[7]Membership on both the SRT and TPF is limited to highly trained police officers who have passed rigorous qualification tests, have been deemed to possess "the proper disposition" and "emotional stability" to function under "high stress situations," and have been approved by the chief of police. Members of the teams participate in deciding whether an officer "[p]ossesses the qualities deemed appropriate" for membership. By 1996, Turgeon had become the first or second person on the SRT's entry team, with the added responsibilities those positions required.

[8]The arbitrator found that the "primary" concern of the team members centered on their entering a building with Turgeon as part of their SWAT team: "[W]hat was going to occur? How would [Turgeon] react? What would [Turgeon] do?"

Gifford learned that "something was wrong" and that Turgeon was "under stress." Gifford discussed these concerns with Turgeon, who, according to Gifford, "had an answer for everything," insisting that his behavior was "taken out of context" or "misunderst[ood]." Gifford concluded that Turgeon should remain on the SWAT teams, but not be permitted to participate in any SRT assignments until both Gifford's and Turgeon's team members had more time to observe Turgeon in the course of his regular patrol work. The team's leaders, "with some doubts," agreed to this "probationary" period.

Gifford then met with Acting Chief Moniz to discuss the matter. After listening to Gifford, Moniz reached a different conclusion and determined that Turgeon should be removed from the SRT. On March 3, 1997, Moniz met with Turgeon to inform him of his decision. Although their respective accounts vary slightly, there is no dispute that Moniz informed Turgeon that he was being removed from the SRT because of concerns that he was not ready to perform in "high-risk" situations.[9] Turgeon disagreed with Moniz's decision and left, "slamming the door behind him." Turgeon's commanding officer later came across Turgeon crying in the locker room "in humiliation and frustration," according to Turgeon, and told him to go home on sick leave. As he was leaving, Turgeon confronted Moniz in the parking lot, saying that he was making a "mistake" and that this was not the end of the matter. Six months later, Turgeon filed a complaint with the MCAD.[10]

2. *Procedure.* We discuss in some detail the proceedings in the MCAD because they inform our decision in large degree. Turgeon's MCAD complaint alleged that he had been discriminated against on the "pretext" that he had a "perceived psychological handicap." After an initial review of the case, the MCAD recommended that the parties participate in the "MCAD/AAA program on Alternative Dispute Resolution" administered in accordance with MCAD's policy on alternative

[9]Moniz later informed Turgeon by e-mail that he was also removing him from the TPF.

[10]Turgeon's union declined to pursue a grievance challenging the decision to remove Turgeon from the SRT, informing Turgeon that his removal was a management decision, not subject to the parties' contract.

dispute resolution (Policy 96-1). The policy was adopted to provide "minimum standards of quality and procedural safeguards," and to ensure "just and fair processes and outcomes" for disputes resolved under the program. The MCAD undertook to retain jurisdiction over Turgeon's complaint "at all times while this [ADR] process is pending."

On October 19, 1998, eleven months after Turgeon filed his complaint, he and the city executed a submission to arbitration (submission), agreeing to submit their dispute to "binding arbitration under the MCAD Program on ADR (Policy 96-1)."[11] The city agreed to do so in reliance on the MCAD's representation that it would retain jurisdiction of the complaint. As described in the submission, Turgeon claimed that he was removed from the SRT and the TPF because of concerns that he was "ready to 'snap,' " that he was "perceived to be under stress," and that he was "perceived to be handicapped." Turgeon requested that "his personnel file reflect the fact that he is fit for duty," that he be awarded "monetary damages for all losses suffered to date," and that he be "reinstated to all [t]actical teams." An arbitrator was appointed, the parties agreed to the issues to be resolved by the arbitrator,[12] and the MCAD suspended further "processing" of Turgeon's complaint. See Policy 96-1, § I.1(b).[13]

Fourteen months later, on December 13, 1999, the arbitrator rendered a decision in favor of Turgeon, noting twice that the case had been arbitrated under the MCAD's Policy 96-1. He ordered the city to reinstate Turgeon as a member of the SRT and the TPF, awarded Turgeon back pay with interest,

[11]Turgeon's MCAD complaint named three parties: the city of New Bedford, the New Bedford police department, and Deputy Chief Carl Moniz. The "submission to arbitration" named only the city as a party.

[12]According to the arbitrator, the parties agreed to the following statement of the issues: "Whether or not [Turgeon] was removed from the TPF and the SRT by a *bona fide* personnel decision, or was the decision to remove him based on a 'perceived disability.' If it was based on that perception, that Turgeon suffered from emotional instability, did the decision and its implementation violate Chapter 151B, and the ADA, and, in that case, what shall the remedy be?"

[13]Policy 96-1, § I.1(b), provides in relevant part: "When the parties choose arbitration, the processing of a complaint by the MCAD will be suspended . . . ."

emotional distress damages, and awarded punitive damages totaling approximately $90,000. On January 12, 2000, the arbitrator issued a "clarification of order"; on March 16, 2000, he issued an "informational order"; and on April 6, 2000, he issued a "final order," in which he also awarded Turgeon attorney's fees in the amount of $25,388.93.

On December 23, 1999, ten days after the arbitrator's initial decision, the city filed an appeal with the MCAD requesting that it exercise its power under Policy 96-1 to set aside the award.[14] The MCAD did not act within thirty business days of the arbitrator's initial decision, dated December 13, 1999. Rather, in April and May, 2000, the MCAD informed the parties that the arbitrator's decision remained pending under its review.[15] Without awaiting the MCAD's decision, on June 7, 2000, Turgeon filed his complaint in the Superior Court alleging that the thirty-day period for setting aside the arbitrator's award as provided in Policy 96-1 had expired. See note 14, *supra.* As noted earlier, he had unsuccessfully sought confirmation of the award pursuant to G. L. c. 251, § 11.[16]

Meanwhile, on June 20, 2000, the MCAD issued its decision denying the city's request to set aside the award and declaring the arbitrator's decision "final," and the case "closed." This gave rise to the second action in the Superior Court, filed on July 18, 2000, in which the city appealed from the decision of the MCAD, relying on G. L. c. 151B, § 6, and naming both Turgeon and the MCAD as defendants.[17] Turgeon and the city

---

[14]Policy 96-1, § I.8(a), states in relevant part: "Thirty business days after the decision of the arbitrator is filed at the [MCAD], the decision will become final and binding on the parties and the case will be closed. Before thirty days have elapsed, the decision may be set aside by an order of two [c]ommissioners of the MCAD."

[15]It is not clear from the record when the arbitrator's final decision, dated April 6, 2000, was filed with the MCAD. See note 17, *infra.* The city claims it was filed "on or about April 14, 2000."

[16]General Laws c. 251 codifies the Uniform Arbitration Act for Commercial Disputes. Under § 11, the prevailing party in a commercial arbitration may apply to the court for confirmation of the arbitrator's award.

[17]Turgeon argues that the city's appeal was untimely because, under Policy 96-1, the MCAD made a "final" decision on May 26, 2000, by virtue of taking no action within thirty days after the arbitrator's decision was filed with the MCAD. See notes 14 and 15, *supra.* We disagree. On May 26, 2000,

filed cross motions for judgment on the pleadings, and the MCAD filed a motion to dismiss on jurisdictional grounds. The second judge in the Superior Court denied MCAD's motion and then, in a brief memorandum, ruled in favor of Turgeon; he refused to set aside or modify the MCAD's decision.

3. *Standard of judicial review.* Turgeon argues that the express terms of Policy 96-1 require that MCAD's review of an arbitration award be completed within thirty business days. See note 14, *supra.* Thereafter, he continues, the arbitrator's decision is "final," the matter is "closed," and the parties are free to seek confirmation of the award in the Superior Court pursuant to the provisions of G. L. c. 251, § 11. The city contends, and a judge in the Superior Court agreed, that G. L. c. 251 is inapplicable to an award by an arbitrator who proceeds, as here, under the MCAD ADR program, and that G. L. c. 151B, § 6, provides the exclusive avenue for judicial review of such awards. We agree with the well-reasoned decision of the Superior Court judge.

Policy 96-1 provides a mechanism for the resolution of discrimination claims as an alternative to the MCAD's statutory and regulatory procedural requirements. The policy reflects an admirable effort by the agency to resolve claims of discrimination in a timely and efficacious manner. By the policy's express terms, a case remains subject to the MCAD's review, so that the agency may be assured that every arbitrated decision is consistent with the important public policies the MCAD enforces.[18] As explained in § I.8(a) of the policy, the MCAD may set aside an arbitrator's decision if, among other reasons, the decision "is not in the public interest" because it is

MCAD informed the parties that the case remained under its review. There is no evidence in the record that either party objected to this waiver by MCAD of its own thirty-day review rule. See Policy 96-1, § I.8(a). The city's appeal to the Superior Court was timely filed within thirty days of the MCAD's final decision, dated June 20, 2000.

[18]Policy 96-1 requires that the parties submit the matter to arbitration voluntarily and with the advice of counsel, and that the arbitration incorporate the protocols outlined in the policy. § I.1(a)-(c). Specifically, "[t]he MCAD will not recognize those arbitrations that do not incorporate the protocols outlined in [the] policy bulletin." *Id.* at § I.1(c).

"palpably wrong" or "clearly repugnant to the purposes and policies of the [c]ommission."[19]

Thus, discrimination cases that proceed to arbitration under the MCAD's ADR program remain at all times within the MCAD's exclusive jurisdiction, subject to its review before any arbitration decision is "final." An arbitrator's decision is, accordingly, not free standing. It reflects the MCAD's considered judgment that the decision is consonant with the purposes and policies of our antidiscrimination laws. It follows, necessarily, that the final decision is a decision of the MCAD and must be reviewed as such. See G. L. c. 151B, § 6. Judicial review accorded the decisions of independent arbitrators under G. L. c. 251 is simply inapplicable in these circumstances.

As provided in G. L. c. 151B, § 6, judicial review proceeds under the well-established standards mandated by G. L. c. 30A, § 14 (7): the reviewing court may set aside or modify the decision because, among other reasons, it exceeds the authority of the agency, is based on an error of law, or is arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. See G. L. c. 30A, § 14 (7) (*b*), (*c*), and (*g*). The MCAD and the city agree that a court should review to determine only whether the MCAD complied with its own Policy 96-1, applying the standards of G. L. c. 30A, § 14 (7). Stated differently, the court should review the decision of the

---

[19]Policy 96-1, § I.8(a), provides: "The Commissioners may set the decision aside if, after reviewing it, they believe the decision is not in the public interest based on the following criteria:

"i. the award was procured by corruption, fraud or other undue means;

"ii. there was evident partiality by an arbitrator appointed as a neutral, corruption of the arbitrator or misconduct prejudicing the rights of any party;

"iii. the arbitrator exceeded their [*sic*] powers or refused to hear evidence material to the issues in dispute;

"iv. the decision of the arbitrator is palpably wrong and/or is clearly repugnant to the purposes and policies of the Commission;

"v. every reasonable presumption will be made in favor of the award.

"If a decision is set aside by the Commissioners, the complaint shall be reinstated at the [MCAD] back to the point at which the parties elected arbitration and will then proceed along the normal course to adjudication."

agency (in this case MCAD's decision to affirm the arbitrator's award) rather than the initial decision of the arbitrator itself.[20] We agree. Our task is to determine the validity of MCAD's own decision that the arbitrator's award was not "palpably wrong" or "clearly repugnant to the purposes and policies" of the MCAD. See note 19, *supra*. See also *Howe* v. *Health Facilities Appeals Bd.*, 20 Mass. App. Ct. 531, 537 (1985) ("Our search has revealed no statutory scheme in which the scope of judicial review was broader than the scope of review before the administrative body whose decision was subject to review"). While we do not set aside ordinary arbitration decisions on grounds of factual or legal error, see *Lynn* v. *Thompson*, 435 Mass. 54, 61-62 (2001), and cases cited, this particular arbitration was subject to a standard of review (whether it was "palpably wrong") under Policy 96-1, and the parties are entitled to have the agency apply that standard. When the parties agreed to arbitration under Policy 96-1, they agreed to a form of arbitration that included review under a standard of "palpably wrong," and the customary limitations on the review of arbitration decisions were thus supplanted by the standards articulated in Policy 96-1. If, as we conclude, it is evident that the arbitrator's decision was "palpably wrong," the MCAD's decision to uphold it must be set aside. In making our determination, we review the agency's decision to uphold the arbitration award pursuant to the standards set forth in G. L. c. 30A,

---

[20]During the course of these proceedings, the MCAD's arguments have evolved, to say the least. In the first Superior Court action, the MCAD argued that judicial review of arbitration awards under Policy 96-1 should proceed only under G. L. c. 251. In the second Superior Court action, the MCAD hewed to this same position, explaining that the MCAD's review of an arbitration award under Policy 96-1 was not a "final" agency action under the MCAD's regulations; that employment discrimination claims voluntarily submitted to arbitration should be treated as any other labor dispute and exempt from G. L. c. 30A review; that application of G. L. c. 30A defeats the finality of the ADR process; and that the parties did not agree to G. L. c. 30A review when they submitted their dispute to arbitration. On appeal here it has abandoned that position.

When the Superior Court judge in the second action rejected MCAD's G. L. c. 251 position, MCAD then argued that the standard of review should be whether the MCAD's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See G. L. c. 30A, § 14 (7). On appeal here the MCAD argues that judicial review of its decision should be limited to a review for "abuse of discretion."

§ 14 (7). See *Lavelle* v. *Massachusetts Comm'n Against Discrimination*, 426 Mass. 332, 334 (1997). We reject the MCAD's attempt to cabin our review to an "abuse of discretion" by the agency. See note 20, *supra.*

4. *The MCAD decision.* The arbitrator found that Turgeon presented "credible evidence" that his removal from the SRT and TPF teams was based "in part" on the perception that he was handicapped, and that Turgeon had established a prima facie case of handicap discrimination.[21],[22] He further found that the city did not prove a legitimate, nondiscriminatory reason for removing Turgeon from the SWAT teams. The city argues that the decision was "palpably wrong" and "repugnant to [the MCAD's] purposes and policies," because Turgeon was not regarded as "handicapped" as that term is defined in G. L. c. 151B, § 1 (17). We agree, and hold that the MCAD's affirmation of the arbitrator's decision was an error of law.

Claims of handicap discrimination, including a perception of ("regarded as") impairment, proceed under the well-settled three-stage order of proof. See, e.g., *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 821 (1997); G. L. c. 151B, § 1 (17). To satisfy his initial burden of establishing a prima facie case of unlawful employment discrimination on the basis of handicap, *id.*, Turgeon was required to present credible evidence that he was (1) "handicapped"; (2) "capable of performing the essential functions" of the job "with reasonable accommodation";

[21]Specifically, the arbitrator determined that Turgeon's superiors were concerned about his "emotional stability" and felt that he "still suffered from stress" from the fatal shooting.

[22]Turgeon argues on appeal that there was also evidence that he had an "actual" impairment, that he had a "record" of an impairment, and that he had a work-related injury. See G. L. c. 152, § 75B. It is too late for Turgeon to pursue these claims. In his MCAD complaint, Turgeon claimed only a "perceived" impairment. We would normally limit our review to that claim. In their submission, however, the parties asked the arbitrator to determine whether Turgeon had a "record of" impairment as well as a "perceived" impairment. The city agreed to that submission and is bound by it. The arbitrator's decision, however, addresses only Turgeon's "perceived" impairment. Turgeon did not seek reconsideration of this ruling to address his "record of" impairment claim, and took no appeal to the MCAD. Accordingly, Turgeon has waived any claim of an "actual" impairment, a "record of" having an impairment or a "work-related" injury. See *Albert* v. *Municipal Court of Boston*, 388 Mass. 491, 493-494 (1983).

and (3) subject to an adverse action by his employer; and that (4) the position he had occupied remained open and the employer sought to fill it. G. L. c. 151B, § 4 (16). *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, 427 Mass. 1, 3 (1998).[23] Turgeon was therefore required to make a threshold showing that he was "handicapped" within the meaning of G. L. c. 151B.[24] *Id.* Giving complete deference to the factual findings of the arbitrator, we conclude that Turgeon has failed to meet this initial, but essential, burden.

Not all physical or mental impairments constitute a "handicap" under the Massachusetts antidiscrimination statute. General Laws c. 151B, § 1 (17), provides that a "handicap" is (*a*) an actual "physical or mental impairment which substantially limits one or more major life activities"; (*b*) a "record of having *such* impairment"; or (*c*) "being regarded as having *such* impairment" (emphases added). Subparts (*b*) and (*c*), by their terms ("such impairment"), incorporate all of the requirements of subpart (*a*): every plaintiff must demonstrate that an actual impairment, "record of . . . impairment," or being "regarded as having [an] impairment" "substantially limits one or more major life activities."[25] See, e.g., *Murphy* v. *United Parcel Serv., Inc.*, 527 U.S. 516, 521-522 (1999) ("a person is

[23]General Laws c. 151B, § 4 (16), provides that it is unlawful for an employer "to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation." Because Turgeon was relieved only of some job responsibilities, and his employment status as a police officer remained otherwise unchanged, his claim under G. L. c. 151B, § 4 (16), is that he was "otherwise discriminate[d] against."

[24]In his MCAD complaint, Turgeon purported to bring charges under both G. L. c. 151B and the Federal Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq. (2000). The parties sought arbitration of claims under G. L. c. 151B only, and the arbitrator noted that he could make no findings under Federal law as the arbitration was conducted pursuant to Policy 96-1, which is governed solely by G. L. c. 151B. Our review is limited to Turgeon's claims under G. L. c. 151B.

[25]Relying on *Talbert Trading Co.* v. *Massachusetts Comm'n Against Discrimination*, 37 Mass. App. Ct. 56, 61 (1994), the MCAD argues that in a case of a "regarded as" impairment, G. L. c. 151B, does not require a specific finding concerning a "substantial limitation" of a "major life activity." In that case, the Appeals Court did not address the question directly,

'regarded as' disabled within the meaning of the [Americans with Disabilities Act] if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities").[26]

The first requirement, whether a plaintiff has demonstrated that he is "handicapped" within the meaning of G. L. c. 151B, § 1 (17), is determined by a three-step analysis. See *Bragdon* v. *Abbott*, 524 U.S. 624, 631 (1998); *Carroll* v. *Xerox Corp.*, 294 F.3d 231, 238 (1st Cir. 2002); *Lebron-Torres* v. *Whitehall Labs.*, 251 F.3d 236, 239-240 (1st Cir. 2001).[27] First, we consider whether a plaintiff's condition, actual or perceived, constitutes a mental or physical "impairment." *Bragdon* v. *Abbott, supra.* Second, we determine whether the life activity curtailed constitutes a "major" life activity as defined in G. L. c. 151B, § 1 (20), and its accompanying regulations. *Id.* Third, "tying the two statutory phrases together, we ask whether the impairment *substantially limited* the major life activity" (emphasis added). *Bragdon* v. *Abbott, supra.* Under this framework, " 'it is insufficient . . . to merely submit evidence of a medical diagnosis of an impairment.' . . . Rather, those seeking [G. L. c. 151B] protection must offer evidence that 'the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.' " *Carroll* v. *Xerox Corp., supra*, quoting *Toyota Motor Mfg., Ky., Inc.* v. *Williams*, 534 U.S. 184, 198 (2002).

and we do not read its decision to dispense with this requirement. To the extent that the *Talbert Trading Co.* case is inconsistent with our ruling, it is overruled.

[26]We consider Federal case law construing the cognate Federal unlawful discrimination statutes, unless we discern some reason to depart from those rulings. See *Wheatley* v. *American Tel. & Tel. Co.*, 418 Mass. 394, 397 (1994). See also *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233, 237-238 (2001).

[27]We have not previously articulated this three-step analysis for resolution of the first part of the first prong of claims of handicap discrimination under G. L. c. 151B. The analysis contained in *Bragdon* v. *Abbott*, 524 U.S. 624, 631 (1998), and followed by the United States Court of Appeals for the First Circuit to resolve cases concerning G. L. c. 151B, see, e.g., *Carroll* v. *Xerox Corp.*, 294 F.3d 231, 237-238 (1st Cir. 2002), is consistent with the plain language of G. L. c. 151B, § 1 (17), and we see no reason to deviate from Federal law in this respect. Cf. *Dahill* v. *Police Dep't of Boston, supra* at 242 (Massachusetts law concerning mitigating or corrective devices different from Federal law).

Turgeon alleges that he was "regarded as" having "emotional problems" and being "mentally unstable." The arbitrator in turn found that Turgeon's superiors perceived that he "suffered from stress" and might be mentally unstable. Do these constitute a mental impairment? We can imagine that in some cases, what is referred to in lay terms as "stress," "emotional problems," or a lack of "mental stability" may constitute an "impairment" under the statute. We will, therefore, assume, without deciding, that Turgeon satisfied the first step of establishing that he had a perceived "impairment."

As to the "major life activity" at issue, Turgeon alleged that he was "removed" from two SWAT teams because of the perceived "impairment." Although he never addressed the point, the arbitrator concluded, in essence, that the major life activity at issue here was a change in Turgeon's working conditions. General Laws c. 151B, § 1 (20), provides that "major life activities" includes "working."[28] Giving Turgeon the full benefit of any doubt, we assume for purposes of our analysis (without deciding) that he satisfied the second step, and established that the "major life activity" at issue is "working."[29]

Finally, we must determine whether Turgeon was perceived to have a mental impairment that "substantially limited" the major life activity of working. *Bragdon* v. *Abbott, supra* at 631. In so doing, we first consider any relevant authority from the MCAD itself. According to its guidelines, "[a]n impairment substantially limits an individual's ability to work if it prevents or significantly restricts the individual from performing *a class of jobs* or *a broad range of jobs* in various classes" (emphasis added). MCAD Guidelines: Employment Discrimination on the

---

[28]In this respect the Massachusetts statute is different from its Federal counterpart. The Federal ADA does not define "major life activity." See 42 U.S.C. §§ 12101 et seq. Regulations of the Equal Employment Opportunity Commission, however, define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, *and working*" (emphasis added). 29 C.F.R. § 1630.2(i) (2003).

[29]The United States Supreme Court has questioned whether "working" qualifies as a "major life activity" under Federal law. See *Murphy* v. *United Parcel Serv., Inc.*, 527 U.S. 516, 523 (1999); *Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471, 492 (1999). Because we do not consider any claims under the ADA, we need not consider whether, applying Federal law, we would reach the same conclusion. See note 24, *supra*.

Basis of Handicap Chapter 151B, § II.A.6 (1998) (MCAD Guidelines). Those guidelines are entitled to substantial deference. *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233, 239 (2001) ("guidelines represent the MCAD's interpretation of G. L. c. 151B, and are entitled to substantial deference, even though they do not carry the force of law"). Moreover, the MCAD guidelines are, in this respect, identical to the Federal regulations,[30] and are in accord with substantial Federal precedent interpreting those regulations. See, e.g., *Murphy* v. *United Parcel Serv., Inc.*, 527 U.S. 516, 519-520, 523-525 (1999) (no perception of handicap where mechanic with high blood pressure failed Department of Transportation health certification and lost job that required him to drive commercial vehicles, because plaintiff employable in other types of mechanical jobs); *Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471, 475-476, 491-494 (1999) (no perception of handicap where severe myopia prevented complainants from qualifying as commercial airline pilots, because complainants could work as regional pilots or flight instructors)[31]; *Carroll* v. *Xerox Corp.*, 294 F.3d 231, 239-241 (1st Cir. 2002) (no handicap where sales manager suffering from anxiety and stress transferred to nonmanagerial, sales position and then retired, because no evidence he could not work in that class of jobs); *Lessard* v. *Osram Sylvania, Inc.*, 175 F.3d 193, 197-199 (1st Cir. 1999) (no perception of handicap where injured hand prevented plaintiff from perform-

---

[30]Title 29 C.F.R. § 1630.2(j)(3)(i) provides in relevant part that as applied to "working," "[t]he term substantially limits means significantly restricted in the ability to perform either a *class of jobs* or *a broad range of jobs in various classes* as compared to the average person having comparable training, skills and abilities. *The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.*" (Emphases added.)

[31]The arbitrator misunderstood the city's reliance on *Murphy* v. *United Parcel Serv., Inc.*, supra, and *Sutton* v. *United Air Lines, Inc.*, supra. As the city explained, it did not rely on these cases for their holdings with regard to mitigating or corrective devices, an issue not present in this case. The city relied on the Supreme Court's rulings to the effect that termination from a single, particular job is not sufficient to prove that an employer "regards" the employee as "substantially limited" in the "major life activity" of "working." *Murphy* v. *United Parcel Serv., Inc.*, supra at 523-525. *Sutton* v. *United Air Lines, Inc.*, supra at 491-494.

ing particular welding job, and employer had no other types of welding positions available).

Although Turgeon in effect argues that we should ignore the MCAD guidelines, we see no reason to do so. A perception that an employee is unable to perform only a particular aspect (SWAT team membership) of a single, particular job (New Bedford police officer) is not sufficient to satisfy the "substantial limitation" requirement of the statute. An employee is "regarded as" having a "substantial limitation" on the major life activity of "working" only if his perceived impairment precludes him from performing a class of jobs. Turgeon, of course, returned to active duty as a police officer assuming all of the responsibilities (and withstanding all of the stress) that the position demands. The record is undisputed that he performs the same duties as other officers, some (perhaps many) of whom serve on neither SWAT team. There is no evidence to suggest that Turgeon's superiors regarded him as limited in his ability to perform as a police officer on active duty. There is no evidence to suggest that he could not find employment as a police officer in any other city, State, or Federal police department, or in a "broad range of jobs" such as any other law enforcement position or as a security guard for a private employer. That Turgeon's superiors assigned him to full-time active duty as a patrolman affirmatively and conclusively demonstrates that they did not regard him as substantially limited in the major life activity of working.

The MCAD suggests an alternate argument to defend its decision to affirm the arbitrator's award. It argues that the "major life activity" at issue in this case is not "working," but "mental and emotional processes such as thinking, concentrating and interacting with others," and that Turgeon's superiors regarded him as having an "impairment" that "substantially limited" those activities. We will assume, solely for the purpose of considering MCAD's theory, that "mental and emotional processes such as thinking, concentrating and interacting with others" were the "major life activities" at issue in this case.[32] To prevail under the MCAD's theory, there must be credible

[32]"[M]ental and emotional processes such as thinking, concentrating and interacting with others" are not included in the statutory definition of "major

evidence that Turgeon's superiors in the department regarded him as "substantially limited" in his ability to think, concentrate, and interact with others, as compared to the ability of the average person in the general population.[33] There is no such evidence. When Turgeon returned to active duty he was provided with a lethal weapon and assigned to patrol duties, undertaking all of the responsibilities of a uniformed police officer. It is inconceivable that Turgeon's supervisors would have him assume these responsibilities if they regarded his ability to think, concentrate, and interact with others as substantially less than that of the average person on the street. The day-to-day work of a police officer on patrol is demanding in every respect, physically and mentally. His exercise of judgment, his capacity to react appropriately, often within a split second, and his interaction with people in stressful circumstances are the very essence of a police officer's responsibilities. If (as we strongly doubt) the arbitrator's decision, or the MCAD's independent decision based on its own review of the record, was based on a finding to the contrary, it was "palpably wrong."

We recognize that a decision to proceed to arbitration is ordinarily a choice to avoid cumbersome legal proceedings. We do not require that an arbitrator's decision under Policy 96-1 have the fine texture of a reasoned agency decision. But a decision to resolve a discrimination claim under MCAD's ADR program does not confer unfettered discretion on an arbitrator. Employees may be subjected to workplace decisions that they perceive are unfair, ill conceived, arbitrary, or vindictive. An employer's decision may in fact be any (or all) of these. But not every claim of workplace unfairness is a claim of discrimina-

---

life activities." See G. L. c. 151B, § 1 (20). Such activities are, however, listed in the MCAD guidelines as examples of major life activities. See MCAD Guidelines § II.A.5.

[33]Unlike the major life activity of working, the MCAD guidelines do not define what constitutes a substantial limitation of the major life activity of "mental and emotional processes such as thinking, concentrating and interacting with others." The guidelines offer only a general definition of "substantially limits," which states in part, "[a]n impairment is substantially limiting if it prohibits or significantly restricts an individual's ability to perform a major life activity *as compared to the ability of the average person in the general population to perform the same activity*" (emphasis added). MCAD Guidelines § II.A.6.

tion, and the MCAD has no jurisdiction to order relief for workplace disputes that arise for reasons other than discrimination. Turgeon was distressed and frustrated by the decision to remove him from the department's SWAT teams, and his distress and frustration may well be justified. But he has not demonstrated that the decision was made because he was regarded as "handicapped" under our antidiscrimination laws. Nothing in our decision should suggest that Turgeon was or remains unqualified for participation in the SWAT teams. That determination remains properly and exclusively with the New Bedford police department.

5. *Remaining claims.* Because of our decision, we need not consider the city's argument that the arbitrator improperly considered allegations that Moniz retaliated against Turgeon for exercising his rights under the First Amendment to the United States Constitution, although we note that those allegations do not constitute claims of discrimination. We similarly need not consider its claims that the arbitrator incorrectly concluded that the city did not proffer legitimate, nondiscriminatory reasons for its actions, or that the remedies imposed by the arbitrator were beyond the authority of the MCAD. We note only that an arbitrator proceeding under MCAD Policy 96-1 may impose only those remedies available under G. L. c. 151B. See Policy 96-1, § I.7(c).[34]

We affirm the judgment dismissing Turgeon's request for confirmation of the arbitrator's award under G. L. c. 251. We reverse the judgment upholding the MCAD's affirmance of the arbitrator's award. We remand the case to the Superior Court, where judgment shall enter for the city.

*So ordered.*

---

[34]Policy 96-1, § 1.7(c), provides: "The arbitrator may impose any remedies that would be available under [G. L. c.] 151B, unless the parties agree in advance of the arbitration, in writing, to constraints on the arbitrator's discretion. One example of the constraints the parties might agree to, would be the imposition of upper and/or lower limits on the size of a damage award." There were no constraints or expansions agreed to in this case.