Kern, Leila R., J.
The plaintiff, Leslie Hooker, brought suit against her prospective employer, Trusted Life Care (TLC), and its President and Chief Executive Officer, Peter Falkson, after TLC revoked its offer for employment. Hooker alleges claims of handicap discrimination, breach of contract, promissory estoppel and tortious interference with an advantageous business relationship. The defendants moved for summary judgment on all counts. For the following reasons, the defendants’ Motion for Summary Judgment as to the claims of handicap discrimination, promissory estoppel and tortious interference with an advantageous business relationship is ALLOWED, and as to Hooker’s claim for breach of contract is DENIED.
BACKGROUND
Leslie Hooker is a certified respiratory therapist and began her professional career in that field in 1978. After several years working at various hospitals, Hooker took a job as a teller at Sovereign Bank in January of 2000. In 2004, Hooker sought to return to respiratory therapy. She renewed her license and attended conferences in hopes of finding a job. Hooker was first introduced to TLC at one of these conferences in September 2004. In late 2004, Hooker contacted TLC to see if they had an opening for a respiratory therapist. TLC invited her for an interview in late 2004 or early 2005. Hooker went to TLC’s office in Canton, Massachusetts, met with Peter Falkson and toured the facilities. During the interview, Falkson indicated that he was interested in hiring Hooker as a sales representative for TLC’s soon-to-open office in Woburn, Massachusetts. Several weeks later, Hooker again contacted Falkson to express her interest in the sales position. Falkson suggested that she meet with Fernando DaSilva, Vice President for Business Development at TLC, as he would be her direct supervisor.
Hooker met with DaSilva to discuss the sales position in more depth. Hooker understood that she would be the only person in the Woburn office during the beginning stages of its opening and that she would be required to travel to hospitals on the North Shore to meet with health care providers on a near-daily basis. Compensation would include a base salary plus commissions, with minimum sales requirements. Hooker would also receive travel reimbursement. Following her meeting with DaSilva, Hooker received an offer for employment letter from Falkson, dated March 4,2005, that she signed and returned. The letter stated in relevant part that: (1) Hooker would begin work at TLC on June 6, 2005; (2) her title would be Sales Associate; (3) her salary would be $600 per week; (4) she would be reimbursed $450 per month for use of her personal car; and (5) she would receive a commission on equipment referrals subject to a minimum quota.
On May 9, 2005, Hooker emailed Falkson to confirm her start date of June 6, 2005. She explained that she was submitting her two weeks notice to Sovereign Bank. Falkson confirmed her start date, and on May 12, 2005, Hooker submitted her letter of resignation to Sovereign. Her last day at the bank was May 27, 2005.
Hooker took a week off between her final day at Sovereign and her first day at TLC. On or about May 30, 2005, Hooker injured her back while doing housework. Her doctor told her she had herniated two discs in her back. She was in excruciating pain on a daily basis and had trouble walking and moving around. Hooker decided to wait a few days before contacting TLC, in case the pain subsided. After several days, Hooker did not feel better and called DaSilva to notify him that she might not be able to start on June 6, 2005. She indicated that if she had to come in, she would try. Hooker also expressed concern about the long drive from her home in Andover to TLC’s office in Canton because she hadn’t driven since her injury. DaSilva told Hooker to rest for the rest of the week and to contact him in a few days, when they would decide if she should reschedule her start date. After their conversation, DaSilva faxed Hooker an itinerary for her orientation during her first week at TLC. She had a full schedule of meetings and field visits set up during the week of June 6 through June 10.
On or about Sunday, June 5, 2005, Hooker spoke with DaSilva again. She said that she was still in pain and did not think she could start Monday. She suggested pushing back the start date to Wednesday, June 8, 2005. At that time Hooker still had not traveled in the car and was unsure whether she could make the drive to Canton. DaSilva told Hooker to call him the next day to reevaluate her condition. After speaking with Hooker, DaSilva sent out an email to TLC employees who were scheduled to participate in Hooker’s orientation. DaSilva explained that Hooker had injured her back “during the week, and was still feeling some of the effects.” He stated that he was hopeful that she would be able to start her orientation on Tuesday, June 7, 2005. Later that day, however, DaSilva emailed Hooker and told her that he had a “better solution that may serve both of us better.” He suggested that she rest for the entire week and start *249 Monday, June 13, 2005. He also noted that the position entailed significant amounts of driving and that the driving would “only exacerbate her condition,” although Hooker testified that she did not know how driving would affect her. He suggested that they reevaluate at the end of the week.
Hooker then received an email from Falkson on the morning of June 8, 2005. He wrote that he was surprised that she could not start Monday June 6, and was “disappointed that [she] could not make it to the office and this is not leaving [him] with a very good feeling.” He also said that they needed to speak. Hooker called his office, but he was not available. Later that day, Hooker received another email from Falkson. He said that he did not think “things were going to work out” and that she should call him immediately. Hooker called Falkson’s office, but again was unable to reach him. Falkson returned her call sometime before Friday, June 10. She told him that she would be able to start Monday June 13, but he responded that he didn’t think TLC would be going forward with the job. Then, on June 10, Falkson sent another email to Hooker, stating that he had spoken to his wife, a corporate attorney, and several others at TLC, and as a result of those consultations he had decided not to move forward with her employment. He said that TLC had made a serious commitment to her position and had expected her to start Monday. Hooker responded via email and explained to Falkson that she had left her previous job on the understanding that TLC had a definite position for her. She also stated that she was serious about the position at TLC, and believed that leaving her prior job was sufficient evidence of her commitment. Falkson did not respond.
Hooker’s back pain persisted throughout the summer of 2005. Between the time she injured her back and September 2005, Hooker testified that she only left the house for doctors appointments. She stayed in bed most of the day, and had trouble getting out of bed, walking up and down stairs, and driving (primarily because she experienced substantial pain in her right leg, which she used for driving). Hooker testified that the daily, intense pain she suffered throughout the summer subsided as of September 2005, but that she still experienced pain that she describes as a “dull ache.” She takes Advil to treat her symptoms.[1] As of March 4, 2008, Hooker had not seen or been treated by a doctor for two years.
On September 27, 2005, Hooker’s doctor cleared her for light-duty work. According to her Division of Unemployment Assistance work search log, Hooker began seeking employment on September 25, 2005. Hooker, however, testified that she posted her resume on Monster.com in June 2005. In February 2006, Hooker took a position as a clerk at the Internal Revenue Service in Andover, Massachusetts. She is still employed there.
Falkson did not seek or accept applications for, nor did he hire, another Sales Associate for the planned Woburn office. In fact, the Woburn office never opened. TLC has since been sold to another entity, and there are no plans for a Woburn office.
DISCUSSION
Summary judgment is appropriate where there are no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); DuPont v. Commissioner of Corr., 448 Mass. 389, 397 (2007). It is the moving party’s burden to affirmatively demonstrate the absence of a triable issue, and that the summary judgment record entitles him to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
When reviewing a summary judgment record, the court must credit well-pleaded facts in the light most favorable to the non-moving party. Williams v. Hartman, 413 Mass. 398, 401 (1992). Bare assertions of inferences, however, raise no genuine issue of material fact so as to defeat summary judgment. Federal Deposit Ins. Corp. v. Csongor, 391 Mass. 737, 742-43 (1984); First Nat. Bank of Boston v. Slade, 379 Mass. 243, 246 (1979) (neither vague allegations and con-clusory statements, nor assertions of inferences not based on underlying facts will suffice to demonstrate genuine triable issue on motion for summary judgment).
I. Handicap Discrimination
The defendants argue that they are entitled to summary judgment because Hooker has no reasonable expectation of proving three of the four essential elements of her handicap discrimination claim. Under G.L.c. 151B, §4(16), it is unlawful for an employer to “dismiss from employment... or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation ...” Claims of wrongful termination in violation of c. 15IB are analyzed using the federal burden-shifting framework first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Wheelock College v. Mass. Comm’n Against Discrim., 371 Mass. 130, 138 (1976). In a handicap discrimination claim, the first stage of the burden-shifting framework requires the plaintiff to establish a four-pronged prima facie case that: (1) she was handicapped within the meaning of c. 151B, §4(16); (2) she was a qualified handicapped individual; (3) she was subject to an adverse employment action; and (4) the position remained open and the employer sought to fill it. City of New Bedford v. Mass. Comm’n *250 Against Discrim., 440 Mass. 450, 462 (2003). The plaintiff does not need to prove each element, but rather must provide evidence that, if believed, would provide sufficient facts to support a judgment in her favor on each element. Whalen v. Nynex Info. Resources Co., 419 Mass. 792, 796 (1995). The defendants contend that Hooker has insufficient evidence to support the first, second and fourth prongs of her prima facie case. Because Hooker need only fail on one element to fail on her claim, only the fourth prong will be discussed, as it is on this point that Hooker’s evidence most clearly fails.
The fourth prong of the handicap discrimination prima facie case is essential for the plaintiff to establish a preliminary inference of disparate treatment. See Whalen, 419 Mass. at 796 (“In a ‘disparate treatment’ case, ‘proof of the employer’s discriminatory motive is critical’ ”). By requiring a plaintiff to show that she was treated differently from or passed over for employment in favor of non-disabled people, it allows a jury to infer that her disability played a role in the employer’s decision. See Blare v. Husky Injection Molding Sys. Boston Inc., 419 Mass. 437, 446 (1995) (in age discrimination case, plaintiff satisfied prima facie burden by showing that after his termination his duties were delegated to employees not within the protected age category).
Here, Hooker has failed to provide any evidence that the defendants kept her position open and sought to fill it. The undisputed evidence shows that TLC did not seek or hire any other person for the Sales Associate position at the anticipated Woburn office. In fact, the Woburn office never opened. TLC abandoned the idea, and was acquired by another company.
Hooker argues that she is not required to show that her position remained open and that TLC sought to fill it because such proof is only required in a “failure to hire” case, whereas her case is a “termination” case. For the purposes of this analysis only, this court will consider the present case a termination case. Hooker correctly cites to “termination” cases that conflate the third and fourth prongs of the prima facie case, see, e.g., Talbert Trading Co. v. Mass. Comm’n Against Discrim., 37 Mass.App.Ct. 56, 59 (1994) (“(3) is being excluded from the position solely by reason of the handicap”), however, several Supreme Judicial Court cases — decided after the cases cited by Hooker— clearly state a distinct fourth prong of the prima facie case that must be satisfied in order to survive summary judgment. In Blare v. Husky Injection Molding Sys. Boston Inc., a “termination” case, the court reviewed the burden shifting framework applied by Massachusetts courts, and, in outlining the prima facie case, included a fourth prong requiring the employee to show that “his employer sought to fill the plaintiffs position by hiring another individual with qualifications similar to the plaintiffs.” 419 Mass. at 441. In Dartt v. Browning Ferris Industries, another “termination” case, the court stated: “We rule that to establish a prima facie case of unlawful employment discrimination on the basis of handicap under G.L.c. 151B, §4(16), a plaintiff must present credible evidence that ... (4) the position he had occupied remained open and the employer sought to fill it.” 427 Mass. 1, 3 (1998) (emphasis added). This fourth prong is an essential element of a handicap discrimination “termination” case, which Hooker has failed to establish, and summary judgment must be allowed.
II. Breach of Contract and Promissory Estoppel
Hooker claims that the defendants breached their offer for employment when they terminated her employment before allowing her to begin. In the alternative, she brings an action for promissory estoppel. The defendants argue that Hooker cannot succeed on either a breach of contract or promissory estoppel theory because she was an employee at will and they were entitled to terminate her at any time, even before she began her employment.
There is sparse Massachusetts case law addressing whether an employer is liable to an employee when it retracts an offer for at-will employment before the employee begins.[2] In Saxonis v. City of Lynn, 62 Mass.App.Ct. 916 (2004), a public school hired the plaintiff as a substitute teacher and told her that she would be hired for a permanent position as soon as her predecessor retired. In a rescript opinion, the Court of Appeals held that “[a] jury could reasonably conclude that, based on [the employer’s] promises and Saxonis’s detrimental reliance thereon, a contract was formed to hire Saxonis as [the former teacher’s] replacement (on an at-will basis), and that Saxonis could recover reliance damages.” Id. at 917.
The Eighth Circuit has provided a more detailed analysis of the reason for allowing an at-will employee to maintain a cause of action against an employer that withdraws an agreement for prospective employment. In Bower v. AT&T, Tech., Inc., 852 F.2d 361, 363 (8th Cir. 1998), the court held that “it may be hard to distinguish the case in which an employee is fired a day after beginning work from the situation in which a potential employee is prevented from assuming a promised at-will position, [but] the cases are different. In the former case, the employer has completely fulfilled his promise; in the latter, the promise has not been kept in any respect.” (Emphasis in original.) In Bower, AT&T told its employees that they would be “phased out" due to cut-backs, but that if they remained with AT&T as the phase-out took place they would be re-hired in a new position. Id. at 362. The court rejected the plaintiffs’ breach of contract claim, but found that they had a viable claim of promissory estoppel. The Connecticut Superior Court made a similar holding in Goldstein v. Unilever, 2004 Ct.Super. 6848, No. 397881 (2004) [37 Conn. L. Rptr. 158]. In Goldstein, the plaintiff did not allege breach of contract, only promissory estoppel. The court found *251 the Eighth Circuit’s distinction between terminations made before and after employment begins to be persuasive, and allowed the plaintiff to maintain an action for promissory estoppel on “the anticipatory breach of a contract for employment at-will.” Id.
Although this court agrees with the rationale behind the Goldstein and Bower holdings, and is bound by the outcome in Scuconis, it does not agree that there cannot be a binding contract for an offer of at-will employment. First, there is no legitimate reason to allow an employer to withdraw an offer for employment under a breach of contract theory but to prohibit the same act under a promissory estoppel theory. Both are contract principles; promissory estoppel is simply a substitute for a contract when there is no consideration to support the contract. Loranger Constr. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 763 (1978). When a promise is enforceable because of detrimental reliance, “it is a contract, and it is enforceable pursuant to a ‘traditional contract theory’ . . .” Id. at 761. If detrimental reliance creates a contract defined by traditional contract theory, it is illogical to say, as the above cases have held, that an at-will employee cannot maintain an action for breach of contract but can succeed on a detrimental reliance contract. Instead of reconciling that inconsistent and paradoxical outcome, however, this court suggests that an offer for at-will employment constitutes a distinct agreement from the at-will employment agreement that controls once employment begins. Rather, “at-will” is a term of the offer for employment. As a mere term of the offer, the at-will status has no effect on the plaintiffs right to recover under a breach of contract theory where an employer revokes an offer of employment that has already been accepted by the employee for valid consideration.[3]
In the present case, the plaintiff entered into a written, signed agreement to begin employment with the defendant TLC on June 6, 2005. By oral modification, the parties moved the start date to June 13, 2005. The offer stated that Hooker’s employment would be governed by the rules of at-will employment. This offer letter, accepted by Hooker, constituted not a “promise” for employment but a contractual obligation to let the plaintiff begin employment in exchange for her agreement to work. The letter agreement is a distinct contract that created binding obligations on Hooker and TLC, including the obligation that TLC let her begin working. The fact that her employment, once commenced, would be governed by the rules of at-will employment has no effect on the binding nature of the obligations contained within the offer agreement. See Bower, 852 F.2d at 363 (“that [the employer] may shortly thereafter fire [the employee] at-will — while perhaps diminishing the security or value of the employment — does not fully eradicate the binding quality of its promise”).
This court finds that the parties had a binding agreement for Hooker to begin employment at TLC. There is a genuine issue of material fact as to which party first breached the contract. If a fact finder determined that Hooker committed a material breach of the contract, did such breach excuse TLC’s performance of its promise? The defendants’ motion for summary judgment on Hooker’s claim for promissory estoppel is allowed, as it is duplicative and unnecessary in light of this court’s recognition of her breach of contract claim. The defendants’ motion for summary judgment on Hooker’s claim for breach of contract, however, is denied.
III. Tortious Interference with Advantageous Business Relationship
Hooker’s final claim is that Falkson tortiously interfered with her advantageous business relationship with TLC. There are four elements of a tortious interference claim that must be supported by sufficient evidence if Hooker is to survive summary judgment: (1) the plaintiff had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference was improper in motive or means; and (4) the interference harmed the plaintiff. Alba v. Sampson, 44 Mass.App.Ct. 311, 314 (1998). Here, Hooker claims that an executive of TLC interfered with her contract. In cases where the defendant is an executive of the third party, the executive is privileged to interfere with the plaintiffs employment and therefore the plaintiff must show that the defendant-executive acted with actual malice. Gram v. Liberty Mutual Insurance Co., 384 Mass. 659, 663 (1981). This requirement seeks to “protect a corporate official’s freedom of action.” Alba, 44 Mass.App.Ct. at 314. Actual malice is defined as a “spiteful, malignant purpose, unrelated to the legitimate corporate interest of the employer.” Sklar v. Beth Israel Deaconess Med. Center, 59 Mass.App.Ct. 550, 554 (2003). An executive’s interference with a plaintiffs employment that is motivated by discrimination "might. . . support an inference of actual malice.” Weber v. Commun. Teamworks, Inc., 434 Mass. 761, 783 (2001).
Hooker claims that she has established a tortious interference claim because she has established a handicap discrimination claim. As discussed above, Hooker has failed to satisfy her prima facie burden on the discrimination claim, and that claim is dismissed. Without more to stand on than the discrimination claim, Hooker’s tortious interference claim must also be dismissed for failure to show actual malice.
ORDER
For all of the foregoing reasons, the Defendants’ Motion for Summary Judgment on the claims of handicap discrimination, promissory estoppel and tortious interference with advantageous business relationships is ALLOWED, and is DENIED as to the breach of contract claim.

Hooker’s injury was similar to the back injury she suffered in 1992. She had trouble walking and experienced pain *252 in her knees and lower back. The pain subsided after three or four months, and Hooker did not experience any problems with her back again until May 30, 2005.

The sole case relied on by Hooker, Ross v. Raytheon Co., 2001 WL 1455863 (Mass.Super. 2001) [14 Mass. L. Rptr. 27], is not analogous. In Ross, the employer promised an employee that it would help him find a new job within the company after his previous position was eliminated, and then failed to do so. The employer argued that it was not liable for breach of contract because it could have fired the plaintiff at any time. The trial judge correctly noted that the employee’s at-will status was irrelevant to his claim that the employer breached its agreement to help the plaintiff find a new position.

This court acknowledges this decision results in the “illogical" outcome of an employee having more protection prior to employment than after she begins. While this illogical outcome may illustrate the harshness of the at-will doctrine, it does not provide the employer with an excuse to breach a contractual offer of employment where the formalities of a contract exist.