Fabricant, J.
INTRODUCTION
This action arises from the termination of the plaintiffs employment with the defendant Legal Sea-foods, Inc. The plaintiff alleges that his termination was caused by discrimination on the basis of age and handicap, and retaliation for the exercise of his right to claim workers’ compensation benefits for workplace injuries. Presently before the Court is the defendants’ motion for summary judgment as to all counts of the complaint. For the reasons that will be explained, the motion will be allowed.
BACKGROUND[1]
The record, considered in the light most favorable to the plaintiff, provides the following factual background. The plaintiff, whose date of birth is March 17, 1958, worked for Legal Seafoods, in its Seafood Operations Department, from 1987 until his termination on June 30, 2000, at age 42. He held various positions over the years; at the time of his termination he was a Fish Department Manager.
Until early 2000, the Seafood Operations Department had responsibility for both purchasing and processing fish, lobster, and other seafood products. The department was headed by the plaintiffs brother-in-law, Arthur Kloack, who held the title of Vice President of Seafood Operations.[2] Kloack reported directly to the president of the company, Roger Berkowitz. Kloack supervised three managers: the plaintiff; Noel James, whose date of birth is September 7, 1959; and Bill Holler, whose date of birth is September 17, 1963.
The record includes somewhat varying versions of the distribution of responsibilities among the plaintiff, James and Holler, and of their skills and performance. Kloack’s affidavit gives this version as to the plaintiff:
Chuck primarily handled the office, taking orders from the restaurants, handling the telephones, and doing other paperwork. Chuck also attended seafood auctions once or twice a week over the last year since another employee retired, and he did some buying under my guidance. Chuck also occasionally supervised the production line when Bill Holler was not in. Chuck’s performance on office duties was excellent, but he did not have strong leadership skills, needed to improve on decision-making, planning and follow-through, and he had some trouble dealing with managers outside the department. Chuck had opportunities to go to the next level as a manager in terms of handling employees, other managers and business decisions, but did not carry himself well.
Kloack conducted performance evaluations of the plaintiff in March of 1997, 1998, and 1999. He gave the plaintiff ratings rather more generous than the evaluation reflected in his affidavit; in 1997, Kloack rated the plaintiff “excellent” in five performance categories, and “outstanding” in attendance; in the latter *297 two years Kloack rated the plaintiff “outstanding” in all six categories.[3]
Regarding Noel James, Kloack’s affidavit indicates that he “ran the operation on weekends, and supervised seafood transport and receiving, and the production line on the days he worked during the week. Noel . . . has excellent people management skills. He shows particular strength in production and is the best manager to work on weekends given his knowledge of the buildings and systems from having worked in other departments.” Bill Holler, according to Kloack’s affidavit, “came to the company after five years running his own fish processing business and several years managing the daily operations of another wholesale fish processing business. Bill had primary responsibility to oversee receiving and production . . . Bill was self-sufficient in performing his duties and showed leadership qualities.”
The plaintiffs deposition testimony casts the roles and qualities of the three in a slightly different light. According to the plaintiff, before James and Holler joined the department, he and Kloack shared functions. The plaintiff testified,
I was still taking in, receiving lobsters, getting lobster prices, doing a little buying through Bill Conte. If he saw that he wanted something, I would make a phone call and purchase them. I would run the guys on the floor. I would run the guys in the office. Basically, me and Arthur kind of intertwined each other because Arthur was sometimes pulled into the fish pier in the morning, so I would be the guy in charge of the operation while he wasn’t there. When he was there, we kind of took on the responsibilities together with Arthur being the lead person.
Later, according to the plaintiff, various other people were hired into the department. The plaintiffs role was “training the new guys that came on and taking care of the daily operation.” When Bill Holler was hired, the plaintiff testified, “I had trained Billy to do some of the office paperwork, to do the purchase orders, to answer the phones for the restaurants, write some of the sheets that are filled out for product going to the restaurants. It was a big training procedure ... I was training him and running the daily operation. .. After Bill was trained, I went back up to Gloucester and started buying fish again . . . and Noel James also worked on the floor. They would both kind of bounce from receiving product and running the floor and the office paperwork.”
Kloack’s deposition testimony confirms some aspects of the plaintiffs version; Kloack testified that the work involved a lot of “teamwork,” that various duties were shared, that the plaintiff had “somewhat” of a role in instructing new employees in the department, and that the plaintiff was capable of performing the tasks that Holler and James performed. The plaintiff, according to Kloack’s deposition testimony, did more paperwork than the others “Because Chuck worked primarily in the office . . . He was the senior man . . . in the management side of it.”[4]
The plaintiff experienced certain work-related injuries during his employment with Legal Seafoods, according to his deposition testimony. Sometime early in his years with the company, he had a back injury that kept him out of work for four months. When he returned, Kloack and various co-workers made comments about the burden on others resulting from his absence. From then on, according to the plaintiffs deposition testimony, his co-workers made comments such as “ Watch out. Don’t hurt your back’ or Watch out. He is going to go out for another couple of months.’ ” When asked at his deposition whether he suffered any adverse consequences in his employment as a result of the injury, the plaintiff cited only these comments from co-workers. The record provides no documents regarding this injury, or any claim for benefits of any kind arising from it, nor did the plaintiff testify regarding any claim for benefits.
The plaintiff had a second back injury in 1997. He testified that he did not recall whether he lost any time from work. Asked whether he suffered any adverse consequences in his job because of the injury, he responded “no, not really, no.” A third back injury occurred in 1998. The plaintiff testified that he did not lose any time from work after the 1998 injury, and did not recall any adverse consequences in the job in connection with that injury. In January 1999, the plaintiff suffered a cut finger at work. He testified that did not lose any time from work, and he did not recall suffering any adverse consequences in his job. He offers documents that appear to reflect workers’ compensation claims for these three injuries.[5]
In his deposition testimony the plaintiff recalled two other work-related injuries, one to his rotator cuff and one to the back of his foot. He did not identify the timing of either. He did not lose any work time in connection with either of those injuries. Asked whether he suffered any adverse consequences in the job from the rotator cuff injury, the plaintiff answered “yes,” but did not elaborate. As to the foot injury, the plaintiff recounted that his complaints to the effect that the injury had been caused by a lack of training of employees elicited “a little bit of irritability in the management.” He offers no documents regarding these injuries, or any claim for benefits arising from them. The plaintiff does not contend, and has not offered any evidence to indicate, that any of his injuries resulted in impairment of any major life activity.
In 1999, the company’s independent auditor, Deloitte & Touche, conducted an examination of the company’s purchasing and processing operations. The auditor presented the results of its examination in a report dated February 2000 entitled “Procurement Process Controls Review.” The auditor recommended, among other changes, that the company “Segregate *298 purchasing and receiving/operational responsibilities for control purposes.”[6]
The company adopted the auditor’s recommendation. In April of 2000, Berkowitz informed Kloack that he would no longer have responsibility for processing, but would be responsible only for purchasing. Kloack’s title changed to Vice President of Seafood Buying, and he no longer supervised any employees. He assumed responsibility for paperwork related to the purchasing function himself. At about the same time, the company hired William Struzziery as Executive Director of Seafood Production.[7] Struzzieiy was placed in charge of the processing functions, and assigned the role of supervising the three managers who had previously reported to Kloack: the plaintiff, James and Holler. Struzzieiy reported to Chief Financial Officer Bruce Cartwright, as well as to Roger Berkowitz.
Soon after assuming his position, Struzzieiy promoted Bill Holler to the newly created position of Director of Seafood Production. James and the plaintiff remained in their positions as Fish Department Managers, reporting to Struzzieiy. At some point during this period, according to the plaintiffs deposition testimony, Struzzieiy inquired about the plaintiffs back, asking “how are you going to check the fish in Gloucester.” The plaintiff responded that “they had a driver with me for a while, a driver and a helper.” Other than this exchange, the plaintiff testified, no one with supervisory responsibility over the plaintiff made any comments about the plaintiffs back injury.
Struzzieiy used his first weeks on the job to form impressions of his department and its personnel. He recites in his affidavit:
Upon observing the seafood processing operations for several weeks during the reorganization, it became apparent to me that the Seafood Production Department did not need a separate employee, and certainly not a highly-paid Fish Department Manager, to handle the office duties. I recommended that we eliminate one of the two Fish Department Manager positions. I had observed Noel James performing his duties in supervising transport, receiving, and the production line, and I concluded that he has strong leadership skills and a good relationship with the employees on the production line, has good knowledge of the seafood operations and other departments, is efficient and results-oriented. I had observed that Chuck Courtois did not have these same qualifications, and he avoided independent decision making responsibilities, and did not have a good relationship with subordinates or other managers in the Company. I therefore recommended that Noel James be retained and that Chuck Courtois, who had been performing the office duties, be laid off as a result of the reorganization.
Struzzieiy’s deposition testimony is generally consistent with this recitation, although less definitive. He testified that “I felt we were administratively heavy. The duties being handled at that time were more useful to be done out on production floor; and that for the administrative duties a manager may not be necessary to handle whatever administrative duties were inside the operation.” In observing the three managers, Struzzieiy testified, he determined that Holler was “technically as far as dealing with fish, veiy strong. Results oriented, that he could see fish, know fish, and make a quick, honest decision type of evaluation of what needed to be done next.” The plaintiff, in Struzziery’s opinion did not “see fish and know fish as well.” Holler, according to Struzzieiy, was an “independent thinker, would make a decision on his own.” James, in Struzzieiy’s view, had “overall knowledge of the company and production areas and employees, seemed to have a great rapport with all the employees and a good knowledge of what eveiything was.” The plaintiffs strength, according to Struzzieiy, was “knowledge of the inside workings of the office, dealing with the restaurants.” He also had knowledge of “the work on the floor” and of the fish products, but he had weakness with respect to “independent thinking,” in that he “would want to consult with people on certain issues, want to talk it out type of thing.”
On Saturday, April 29, 2000, the plaintiff began to experience symptoms of illness. On Monday, May 1, 2000, he was diagnosed with Campylobacter J infection, described by Legal Seafood’s Director of Quality Control as “a common food-borne illness.” The plaintiff remained out of work until Wednesday, June 28,2000. He applied for and was granted benefits through the company’s short-term disability insurance. On the application form, he and his physician checked boxes indicating that the disability arose from “an illness,” and did not check boxes indicating that it was work-related. The hospital’s billing department, however, attempted to collect from Legal Seafoods, apparently based on information provided by the plaintiff to the effect that his condition was work-related. The company rejected the claim, responding that the condition was “not work related.” The plaintiff did not file a workers’ compensation claim in connection with the illness.
The plaintiff now takes the position that he contracted the infection from chicken consumed at the company’s commissaiy at lunch on the Friday before his symptoms appeared. His support for this contention is that he ate breakfast and lunch at the cafeteria during the week; although he had dinner at home, no one else in his family became ill; he had pizza out on Saturday, before his illness appeared, but his doctor said pizza could not have been the cause because pizza is cooked at high temperature; and “it is very, I guess known, that chicken product is a cause of Campylobacter J.”[8] The defendant denies this contention, and offers the opinion of its Director of Quality Control, trained in “Food Science,” that the plaintiff could not have contracted the illness at work because *299 other employees ate the some food and no others became ill.
Struzzieiy gave his evaluation of the three managers to Cartwright, along with the recommendation “that we were top-heavy in the department.” Struzzieiy expressed to Cartwright his opinion that the plaintiffs duties could be reassigned without difficulty. When asked by Cartwright who would assume those duties, Struzzieiy testified, he responded that they would be shared or, if necessary, a part-time administrative person would be hired. According to the deposition testimony of both Cartwright and Struzzieiy, their conversations about the decision included no reference to the ages of any of the three, or to any injuries or illnesses.[9] Kloack was not consulted about the decision to terminate the plaintiff. The decision was, however, consistent with his views of the relative merits of the three managers; he states in his affidavit: “If I were to choose between Chuck, Noel and Bill to run my business, I would choose Bill Holler.”
When the plaintiff returned to work after his illness on June 28, 2000, he found that Struzzieiy had become a vice president, and that Bill Holler had become a director. According to the plaintiffs deposition testimony, he asked Struzzieiy if he still had a job. Struzzieiy replied “yes, you do have a job, and I will just tell you one thing right now, if you fuck with me once, that will be the last time that you ever fuck with me because you won’t be there.” The plaintiff understood this statement to indicate that Struzzieiy “was fearful for me, 13 years at Legal, and I’m training him.” The plaintiff testified that he was upset that Struzzieiy had been hired “over” him, in light of his seniority and hard work for the company.
Cartwright informed the plaintiff of his termination on Friday, June 30, 2000, two days after his return to work. The termination took effect that day, although the plaintiff was provided with a severance package, the details of which do not appear in the record. Since the plaintiffs termination, the company has not hired anyone to perform the administrative tasks he previously performed; those duties have been divided among Holler, James, and Struzzieiy.
At the time of the termination, according to the plaintiffs deposition testimony, Cartwright commented, “At your age you are still very marketable.”[10] The plaintiff disagrees; his view, as expressed at his deposition, is that “at 43 years old I was all used up[11] ... I mean, if I had to show all these records to a new employer, do you think they were going to hire me .. . All these injuries happened at Legal, and the amount of time that I was out while I was tiying to do my job, I was all used up.” No evidence indicates that anyone at the company ever said that the plaintiff was “all used up”; as far as the evidence discloses, that phrase is his alone.
The plaintiff filed a charge with the Massachusetts Commission Against Discrimination on October 19, 2000, naming both the company and Cartwright. He alleged that his termination resulted from discrimination on the basis of disability and age, in violation of G.L.c. 151B, §§4(16) and 4. IB, and retaliation. His charge did not specify the conduct for which he alleged the employer had retaliated. The plaintiff brought this action on June 30, 2003, again naming both the company and Cartwright. His complaint alleges age discrimination (count I), “Knowing Violation of the Age Discrimination Act” (count II), disability discrimination (count III), and “Unlawful Retaliation” (count IV), as to both defendants, and malicious interference with advantageous relations against Cartwright alone. Defendants have moved for summary judgment on all counts of the complaint.
DISCUSSION
This Court grants summary judgment where there are no genuine issues of material fact and the record entitles the moving party to judgment as a matter of law. See Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of establishing that there is no dispute of material fact on every relevant issue. See Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a genuine dispute of material fact for trial either by submitting affirmative evidence negating an essential element of the non-moving party’s case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Once the moving party establishes the absence of a triable issue by either of these methods, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. Pederson, 404 Mass, at 17. The opposing party may not rest on the allegations of the pleadings, nor may he rely on “bare assertions and conclusions regarding [his own] understandings, beliefs, and assumptions.” Key Capital Corp. v. M&S Liquidating Corp., 27 Mass.App.Ct. 721, 728 (1989). Mere contradictions of factual allegations, without evidentiaiy support, are insufficient to raise questions of material fact sufficient to defeat a summary judgment motion. Madsen v. Erwin, 395 Mass. 715, 721 (1985), quoting Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3rd Cir. 1972) (noting that conclusoiy statements, denials, and allegations are insufficient to raise material issues of fact). The opposing party’s obligation, rather, is to demonstrate the existence of admissible evidence sufficient to meet his burden of proof on the issues raised by the motion.
*300 In deciding motions for summary judgment, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. The Court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility or find facts. See Dawes, 369 Mass, at 553; Mass.R.Civ.P. 56(c); Colley v. Benson, Young & Downs Insurance Agency, Inc., 42 Mass.App.Ct. 527, 528 (1997); see also Kelley u. Rossi, 395 Mass. 659, 663 (1985). In cases “where notice, intent, or state of mind questions are at issue” summary judgment is often, but not always, inappropriate. See Brunner v. Stone & Webster Engineering Corp., 413 Mass. 698, 705 (1992) (further citations omitted); compare Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129-35 (1997) (upholding summary judgment for defendant in employment discrimination case, where plaintiff provided no evidence to support a finding of pretext).
1. Age Discrimination
To meet his burden of proof at trial on his claim of age discrimination, the plaintiff must present evidence from which the jury could find four elements: (1) that he was a member of the protected class, in that he was age forty or over; (2) that he was terminated or otherwise subjected to adverse employment action; (3) that the employer held an age-based discriminatory animus; and (4) that the discriminatoiy animus caused the adverse employment action. See Lipchitz v. Raytheon Co., 434 Mass. 493, 506-08 (2001); Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116-18 (2002). In the absence of direct evidence as to the latter two elements, a plaintiff may prove those elements by inference, based on the three-stage analysis initiated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and adopted and applied in a series of Massachusetts cases, most recently in Knight v. Avon Products, Inc., 438 Mass. 413, 420-27 (2003). In the first stage, the plaintiff must establish a prima facie case, by presenting evidence that he was forty or over, that he had performed his job at an acceptable level, that he was terminated, and that he was replaced by a similarly or less qualified person who was at least five years younger. See id. at 421, 425.
Here, since the record provides no direct evidence of age discrimination, the plaintiff must proceed by way of the pretext analysis. The evidence clearly meets the first three elements of the primafacie case: the plaintiff was forty-two, he was terminated, and he was performing acceptably. The fourth element is more problematic. The plaintiff was not replaced in any direct sense; no one was appointed to fill the position he had held. Instead, that position was abolished, and the duties he had performed were parceled out among three people: Struzzieiy, James, and Holler.[12] One of the three, Holler, was five and a half years younger, just barely meeting the substantiality requirement as established in Knight, supra. As to qualifications, Holler had less seniority than the plaintiff with Legal Seafoods, but more experience in management, having run his own seafood business and managed another.[13] Perhaps more important, Holler had the confidence of his superiors to a degree that the plaintiff did not; both Kloack and Struzzieiy were of the view that Holler was better able than the plaintiff to make independent decisions and to exercise leadership. The plaintiff has offered nothing to indicate that any supervisor held a contrary view, nor does it appear that the plaintiff had any superiority in objective credentials so as to outweigh these subjective evaluations.[14] The plaintiffs effort to make a primafacie case is thus tenuous at best; if his initial showing supports any inference at all, the inference is weak. See Knight, supra, at 423.
If the plaintiffs evidence is viewed as meeting the requirement of a primafacie case, the next step is the employer’s effort to rebut the inference of discrimination by articulating a legitimate, non-discriminatoiy reason for the termination. See Knight, supra, at 420, n. 4. The defendants here have demonstrated their ability to do that by offering evidence that they terminated the plaintiff to eliminate an unnecessaiy position, and that they chose the plaintiff for termination, rather than Holler, based on characteristics that, while subjective, are work-related and lawful. To meet this response and preserve the inference of discrimination based on the primafacie showing, the plaintiff must present evidence from which a reasonable juiy could find that the employer’s asserted reason was not the real reason, but a pretext. This the plaintiff cannot do with the evidence offered here. As indicated supra, he offers nothing to contest the defendants’ evidence that the employer abolished his position, and nothing beyond his own opinion to rebut the defendants’ showing of his superiors’judgment of his qualities as compared with those of Holler.[15] The plaintiff therefore cannot meet his burden of proof of the elements of discriminatory animus and causation based on a pretext theory, and his claim of age discrimination must be dismissed. See generally, Bruce v. Town of Wellesley, 47 Mass.App.Ct. 800, 805 (1999); Wooster v. Abdow Corporation, 46 Mass.App.Ct. 665, 673 (1999); Gregory v. Raytheon Service Company, 27 Mass.App.Ct. 1170, 1171 (1989).
2. Handicap Discrimination
The elements of a claim of handicap discrimination are similar to those of age discrimination. First among them is that the plaintiff is a member of the protected class — that is, that he is a qualified handicapped person within the meaning of G.L.c. 151B. Under c. 151B, §1(17) the term “handicap” means, “(a) a physical or mental impairment which substantially limits one or more maj or life activities of a person; (b) a record of having such impairment; (c) or being regarded as having such impairment.” Major life activity is defined in §1(20) as “functions, including, but not limited to, *301 caring for one’s self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.” See generally, City of New Bedford v. Massachusetts Commission Against Discrimination, 440 Mass. 450, 461-66 (2003); Labonte v. Hutchins & Wheeler, 424 Mass. 813, 821 (1997). The impairment must be long-lasting or chronic; a temporary disability of short duration does not qualify. See Hallgren v. Integrated Financial Corporation, 42 Mass.App.Ct. 686, 687-89 (1997). Where the claimed impairment is alleged to limit the major life activity of working, the plaintiff must show that his condition significantly restricts him from performing not only a particular job, but “a class of jobs or a broad range of jobs in various classes.” City of New Bedford, supra, at 464. These requirements apply not only to the first prong of the definition, but to the “record of’ and “regarded as” prongs as well; thus, to establish membership in the protected class based on those prongs, a plaintiff must show that he has a record of having a long-term impairment that substantially limited his participation in a major life activity, or that his employer regarded him as having such a condition. See City of New Bedford, supra, at 462.
The evidence offered here indicates that, over the thirteen years of his employment with Legal Seafoods, the plaintiff suffered several injuries and one infection, that some of these conditions kept him out of work for some period of time, the longest such period being four months early in his tenure with the company, and that he returned to work after each such period. Nothing in the record indicates that any of these conditions ever substantially limited the plaintiffs ability to perform any class of jobs, or to engage in any other major life activity. Nor, despite the plaintiffs arguments, does anything in the record suggest that the defendants ever regarded the plaintiff as having any impairment that substantially limited his performance of any major life activity beyond a short-term period. Compare Dartt v. Browning-Ferris Industries, Inc., 427 Mass. 1, 17 (1998) (evidence was “slight” but sufficient to establish that plaintiff was regarded by his employer as having such impairment, where plaintiff had been unable to work for over two years and required two surgical procedures after work-related injuiy).
The plaintiff relies on G.L.c. 152, §75B(1), which provides, in pertinent part:
Any employee who has sustained a work-related injury and is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of such job with reasonable accommodations, shall be deemed to be a qualified handicapped person under the provisions of chapter one hundred and fifty-one B.
The plaintiff reads this provision as displacing the definition of handicap set forth in G.L.c. 151B, §1(17). Under that interpretation, anyone who has ever experienced a work-related injuiy would be a member of the protected class under c. 151B for all time thereafter, without regard to the requirements set forth in that provision. The plaintiff cites no authority for this interpretation.
The defendants propose a narrower interpretation of c. 152, §75B(1) that is consistent with the language and purposes of both statutes. Under this interpretation, an employee who sustains a work-related injuiy is entitled to the protections of c. 15IB during the time that he is affected by that injuiy. Thus, an injured employee is entitled to reasonable accommodation to enable him to return to work, and is protected from discrimination based on the injuiy during the time he is affected by it. Once the injuiy has resolved, his status is the same as that of all other employees; to invoke the protections of G.L.c. 151B, he must establish the elements required under that statute.
In the absence of any guiding authority on the point, this Court adopts the narrower interpretation, which harmonizes the two statutes in issue. As so interpreted, c. 152, §75B(1), does not assist the plaintiff in establishing a prima facie case of handicap discrimination. At the time of his termination, the plaintiff was not suffering from any work-related injuiy. [16] Moreover, even if the requirements of the prima facie case were met, as discussed supra, the record reveals the plaintiffs inability to prove pretext. Accordingly, the defendants are entitled to judgment as a matter of law on the claim of handicap discrimination.
3. Retaliation
The plaintiffs retaliation claim invokes G.L.c. 151B, §4.4A. That statute provides, in pertinent part, that it is unlawful “for any person to coerce, intimidate or threaten to interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter.” The complaint alleges, without specificity, that the plaintiff “exercised statutory rights permitted and protected under G.L.c. 151B.” The record presented on this motion does not identify any conduct of the plaintiff in the exercise of such rights prior to his termination. Indeed, there is nothing whatever in the record to indicate that the plaintiff ever invoked any rights under c. 151B, or engaged in any conduct protected under that statute, prior to his termination.
What the plaintiff did do, apparently, was exercise rights under G.L.c. 152, by seeking workers’ compensation benefits in connection with his various work-related injuries, most recently in January of 1999, some seventeen months before his termination.[17] That conduct was protected not by G.L.c. 151B, but by G.L.c. 152,§75B(2), which makes it unlawful for an employer to “discharge, refuse to hire, or in any other manner discriminate against an employee because the employee has exercised a right afforded by this chapter.” Although the plaintiff has not pled a violation of that provision, the Court assumes, for puiposes of this motion, that he would be permitted to amend his complaint to do so.
To prove a violation of c. 152, §75B(2), the plaintiff would have to show a causal connection between his *302 termination and his exercise of rights under c. 152. See Piderit v. Siegal & Sons Investments, Ltd., 55 Mass.App.Ct. 1, 5-6 (2002); see generally MacCormack v. Boston Edison Co., 423 Mass. 652, 662 (1996) (regarding elements of retaliation claim under G.L.c. 151B). “The mere fact that one event followed another is not sufficient to make out a causal link.” MacCormack, 423 Mass, at 662, n. 11, citing Prader v. Leading Edge Products, Inc., 39 Mass.App.Ct. 616, 617 (1996). Any inference from sequence alone would be particularly attenuated here, where the most recent protected activity was seventeen months before the termination. Lacking any direct evidence, the plaintiff relies for his retaliation claim, as for his discrimination claims, on a theoiy of pretext. That theoxy fails for the same reasons discussed supra; the plaintiff offers no evidence to support it.
4. Malicious Interference
The plaintiffs final claim is that defendant Cartwright maliciously interfered with his employment relationship with Legal Seafoods. To recover on that claim, the plaintiff would have to prove, among other elements, that Cartwright acted for an improper purpose, unrelated to any legitimate interest of the employer. See Sklar v. Beth Israel Deaconess Medical Center, 59 Mass.App.Ct. 550, 554-55 (2003); see also Weber v. Community Teamwork, Inc. 434 Mass. 761, 781 (2001). The only improper motives the plaintiff identifies are the same ones already discussed; discrimination on the basis of age or handicap, and retaliation for the exercise of statutory rights. For the reasons already discussed, the evidence fails to support these contentions. Accordingly, defendant Cartwright is entitled to judgment as a matter of law on the claim of malicious interference.
CONCLUSION AND ORDER
For the reasons stated, the Defendants’ Motion for Summary Judgment is ALLOWED. The Plaintiffs Motion to Strike is DENIED.

The facts presented derive primarily, although not exclusively, from the parties’ statements pursuant to Superior Court Rule 9A(b)(5). The plaintiff has moved to strike the defendants’ statement, contending that it does not accurately reflect the evidentiary material offered in support of it, and also raising certain evidentiary objections to certain materials offered. The Court finds the evidentiary objections raised without merit. The Court has examined the entire record, and concludes that the evidentiary material submitted does support the defendants’ factual assertions, although in some instances the particular citations provided are not precisely accurate. For those reasons, the motion to strike is denied. The plaintiffs response to the defendants’ Rule 9A(b)(5) statement does not identify any evidentiary material contradicting the defendants’ assertions of fact. The plaintiff does present certain additional facts on which he relies, although he does not do so in the manner prescribed by the Rule. The facts presented here include those supported by the evidentiary material submitted that the Court deems pertinent to the issues presented by the motion.

Kloack’s age does not appear in the record. He testified in his deposition that he graduated from high school in 1974, suggesting that he is approximately two years older than the plaintiff, who graduated from high school in 1976.

Nhe categories rated on the evaluation form are attendance, job knowledge and performance, teamwork, cost control, hygiene/sanitation, and growth potential.

James, it appears, had been with the company longer than the plaintiff, having worked in other departments, but had shorter tenure in the Seafood Department.

he documents are less than self explanatory, and are not accompanied by any affidavit.

The plaintiff has moved to strike this document on hearsay grounds. The document is not hearsay, as it is not offered to prove the truth of any matter asserted. Rather, it is offered, and considered, merely to show that the recommendation was made by the outside auditor. The plaintiff also objects to the defendants having submitted a redacted copy of the document. In response, the defendants have now submitted an unredacted copy. Comparison of the two reveals nothing pertinent to the issues presented by this motion that is excluded from the redacted version.

The record does not indicate Struzzieiy’s date of birth. He testified at his deposition that he graduated from high school in 1973, suggesting that he is about three years older than the plaintiff.

The plaintiff does not indicate the basis of this belief, which obviously is not competent evidence. The plaintiffs recitation of his doctor’s opinion regarding pizza is similarly inadmissible.

Nothing in the evidence indicates that Cartwright had any knowledge of the plaintiffs injuries or illness.

Cartwright’s age does not appear in the record. He testified at his deposition that he graduated from high school in 1966, suggesting that he is about ten years older than the plaintiff.

The plaintiff was 42 at the time of his termination.

Kloack, according to the evidence, had already assumed some of the duties the plaintiff had performed before the reorganization, since Kloack himself took on the administrative aspects of the fish purchasing function.

The plaintiff has not offered evidence that Legal Sea-foods made a practice of basing employment decisions on seniority within the company.

The performance review forms do not make any specific inquiry regarding leadership and independent decision-making, although these qualities might be thought relevant to the category of growth potential. The record does not contain Holler’s performance reviews, so no comparison with the plaintiffs is available.

Viewing the organization chart on a somewhat broader time frame, comparing early 2000 with July of that year, one might perceive that the company did not actually reduce the total number of positions performing the fish purchasing and processing functions, but merely substituted Struzziery for the plaintiff. This way of looking at the facts does not assist the plaintiff, because Struzziery is older than the plaintiff.

Chapter 152, §1, paragraph 7(A) defines “personal injury” to include “infectious or contagious diseases if the nature of the employment is such that the hazard of contracting such diseases by an employee is inherent in the employment.” The plaintiff does not suggest that a risk of Campylobacter infection was inherent in his employment with Legal Seafoods. Even if it were, the infection had resolved prior to his return to work on June 28, 2000.

The record establishes as undisputed that the plaintiff did not make a claim under c. 152 for the Campylobacter infection in May of 2000; rather, he received benefits under the employer’s short-term disability insurance policy for his time out of work with that illness.