# United States Court of Appeals
## For the First Circuit

No. 08-1865

SUZANNA SENSING,

Plaintiff, Appellant,

v.

OUTBACK STEAKHOUSE OF FLORIDA, LLC and
CHARLES KOZMITS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Selya, and Lipez,
Circuit Judges.

Paul H. Merry, for appellant.
John F. Welsh, with whom Jennifer Belli and Bello Black &
Welsh LLP, were on brief for appellees.

August 11, 2009

**TORRUELLA**, **Circuit Judge**.  This is an appeal from a grant of summary judgment in a diversity action.  Plaintiff-appellant Suzanna Sensing, who suffers from multiple sclerosis, brought suit against her former employer, defendant-appellee Outback Steakhouse ("Outback"), and her manager, defendant-appellee Charles Kozmits, (collectively, "the appellees"), alleging handicap discrimination in violation of the Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B, § 4.  The district court granted summary judgment in favor of the appellees.  Sensing timely appealed.  After careful consideration, we reverse.

## I. Background

### A.  Facts[1]

Outback operates a nationwide group of steakhouse restaurants, including one located in Peabody, Massachusetts, where the events related to this appeal took place.  Kozmits was the managing partner of the Peabody Outback during the relevant period.  Sensing was employed at the Peabody Outback restaurant from March 2000 until May 2005.  Initially hired as a hostess, Sensing was soon promoted to the position of "takeaway."  A takeaway at Outback takes down customers' take-out orders by telephone, does various order preparation work, packages the orders, and delivers the

---

[1]  As we must on summary judgment, we present "the record evidence in the light most favorable to [Sensing,] the nonmoving party." Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 855 (1st Cir. 2008) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

-2-

orders to customers waiting in the parking lot.[2]  Sensing twice won "Employee of the Month" awards as a takeaway.

In December 2003, Sensing, a diabetic, was also diagnosed with an episodic, remitting-relapsing form of multiple sclerosis ("MS").  MS is a disease affecting the central nervous system. During the disease's aggravated state, known as a "flare-up" or "exacerbation," persons suffering from the disease experience a worsening of neurologic function, which may include numbness in extremities, difficulty with muscular control affecting activities such as walking, grasping, and balancing, increased fatigue, and emotional lability.  Flare-ups can last from a few days to two months or longer.  These episodes are followed by partial or complete recovery periods (remissions), during which persons with MS can function similarly to disease-free persons.  Sensing discussed her medical diagnoses and her symptoms with her co-workers at Outback, including "key employee" Erin Ray, a member of Outback's management who was in charge of scheduling workers' shifts.[3]

_____

[2]  The parties dispute how physically demanding the takeaway job is, but Sensing does not contest that at least occasionally there is pressure on takeaway staff to perform the job quickly.

[3]  While Sensing does not specifically recount discussing her diagnosis with Kozmits, Kozmits admits in his deposition that at least by late fall 2004, he had become aware of Sensing's medical condition.

In November 2004, Sensing experienced her first major MS flare-up. The episode was extremely debilitating: Sensing was bedridden, unable to walk or feed herself without assistance. During the flare-up, Sensing was granted a medical leave from her position at Outback. At the end of the month Sensing's MS symptoms improved and she returned to work at Outback in a "light duty" position, performing tasks such as answering telephones and filling out gift certificates. Sensing's condition continued to improve during this period, though she still had some symptoms and admits to an episode in December 2004 when she had to leave work early.

In February 2005, Sensing informed Kozmits that she wished to return to her previous takeaway role. She provided a note from her neurologist, Dr. Timothy Kelliher, stating that she could resume duties "as tolerated," and Kozmits cleared her to resume her normal takeaway shifts. From mid-February 2005 until April 21, 2005, Sensing worked regularly as a takeaway. During this period Sensing experienced no physical symptoms of MS that impaired her performance, and was able to perform her job in all respects with only minor, unobjected-to, accommodations.[4]

---

[4] Appellees present statements from some of Sensing's co-workers, including Ray, that call into question Sensing's self-assessment of her full physical capacity to work as a takeaway during the period from February to April 2005, and indicate that these concerns were expressed to Kozmits. Sensing does not dispute that these statements were made by her co-workers, but disputes their content. As we must for purposes of summary judgment, we rely on Sensing's version of the facts.

Sensing experienced a minor recurrence of her MS symptoms in early April 2005, when she began to experience some numbness. During her shift on April 21, 2005, Sensing felt unwell and became emotional at work. When Ray asked Sensing what was wrong, Sensing said she had been unable to feel her legs for the past few weeks. Ray said that she should go home, but Sensing replied that she could not because she needed the money. Nevertheless, after arranging to have the remainder of her shift covered and securing her manager's approval, Sensing went home early.

Although she intended to work her next scheduled shift on April 23, Sensing woke up that day again feeling unwell. Sensing spoke to Ray by telephone and told Ray that while she could work if needed, she was still experiencing leg cramps. Ray suggested that Sensing take that shift off as well because another worker could cover her duties. Sensing made clear, however, that she wished to return for her next shift, scheduled for April 27.

On April 27, 2005, just before Sensing's scheduled work shift, Kozmits telephoned her and told her not to report to work that night and that her shift had been covered. Sensing told him that she was fine to work and was planning on coming to work. Kozmits responded that he was "not comfortable" with her coming back to work that night because of the "liability," that she should take the vacation she had previously scheduled for early May, get her medications in order and then call him back. Sensing was upset

and surprised by the decision.  She called Ray to indicate that she was capable of working and needed the shifts.  Sensing also asked Ray for the fax number for Outback so she could fax a new note from her doctor.

The following day, April 28, Sensing visited Kozmits at the restaurant and repeated that she was capable of working and desired to return to work.  She presented Kozmits with the new note from Dr. Kelliher, which stated that she could "return to work without restrictions."  Kozmits responded that he had serious questions about whether Sensing could continue her job as a takeaway and stated that he did not believe that Sensing's doctors "know what's going on."  Kozmits again expressed concerns about liability, stating that he could not have Sensing falling in the restaurant because it would cost the restaurant two to three hundred thousand dollars.  Sensing stated that she was no more of a liability than anyone else, but Kozmits disagreed.  Kozmits said that he would have to contact his corporate superiors for guidance on how to handle the matter.

On April 29 Sensing called and left a message for Kozmits to call her.  Kozmits returned her call on April 30th.  Sensing told Kozmits that she had canceled her planned vacation and wished to return to work.  Kozmits again indicated that he would have to wait for instructions from Outback's corporate office in Tampa,

Florida, before scheduling Sensing for work and that he would get back to her.

Sensing called Outback again on May 3 and left a verbal message with a co-worker asking for Kozmits to call her, but Kozmits never returned her call.[5]  On May 5, Sensing again telephoned Kozmits at the restaurant and repeated her request to be put back on the work schedule.  She stated that she really wanted to get back on the work schedule because she needed the money.[6]  Kozmits replied that he had placed a second call to the corporate office and would let her know as soon as he heard back.  Later that day, Sensing faxed Kozmits the following message:

> Dear Charles: Thank you for the brief chat this morning.  As we discussed I really need an answer today regarding my takeaway shifts. I am planning on returning to my normal takeaway schedule on Wednesday 5/11 and would like to pick back up this Saturday 5/7, unless I hear otherwise. I need to work and cannot drag this on any longer. Thank You, Suzanna.

Shortly after this fax was sent, Kozmits called Sensing back.  He stated that before Sensing would be allowed to return to work as a takeaway, she must submit to an independent medical examination

---

[5]  Kozmits does not recall any such message and claims that "as a matter of practice," he always returns calls that he receives.

[6]  Sensing obtained an additional note from her MS expert, Dr. Guy Buckle, stating that she was evaluated on May 5, 2005 and "medically cleared to return to work full time without restrictions," and that "[she] can carry meals/bags to/from cars/customers as needed."  According to Sensing, she provided Kozmits with this new note, which is dated May 10, 2005, although the record is unclear as to when exactly she did so.

("IME"), at the company's expense and by a physician of their choosing, to determine whether she could safely perform that job.[7] He indicated that while the IME was being set up, Outback might be willing to schedule Sensing for "light duty" work. This light duty work would be paid at approximately half the hourly rate of the takeaway role and involve approximately one-third the number of hours per week. Sensing told Kozmits that she did not know if she could financially manage doing the light duty work, but recalls not giving Kozmits a firm answer because she wanted to discuss the financial effects of doing so with her husband. Kozmits told Sensing that he would look for a physician to do the IME and would get back to her with the details as soon as he found a suitable physician to examine her. Sensing agreed, and said that she would wait to hear back from him regarding the examination.[8]

---

[7] While it is undisputed that Kozmits and Sensing discussed the IME in their May 5 conversation, there is conflicting evidence on the record as to whether this was the first time an IME was discussed, or whether Kozmits had first raised the issue with Sensing in one of their conversations in late April.

[8] In his deposition Kozmits admits that he informed Sensing that she must be examined by a doctor of Outback's choice and that he was attempting to set up an IME and waiting to hear from corporate headquarters about who would be selected to perform the IME, but not that he was supposed to contact Sensing subsequently. In any event, as we are required to "constru[e] the record evidence in the light most favorable to [Sensing]," and "mak[e] all inferences in [her] favor," see Dennis, 59 F.3d at 855-56, we rely on Sensing's version of the facts -- that she was told by Kozmits to await contact from him regarding the identity of the IME, to which she responded that she would wait to hear from him.

After consulting with her husband, Sensing concluded that she could not afford to take the light duty position and that it made more sense for her to apply for unemployment. On May 6, Sensing filed for unemployment. In Sensing's deposition testimony, when asked why she did not agree to take a light-duty position while waiting to hear about the IME, she responded: "it made more sense for me to apply for unemployment than to work three or four hours a day -- I'm sorry -- two to three hours a day for the shift they were talking about." After the May 5 conversation, Sensing also contacted an attorney and did not make further contact with Kozmits directly. Nor did Kozmits make further contact with Sensing.

Kozmits alleges that after several days passed without communication from Sensing, he concluded that Sensing had come to realize that she was no longer capable of performing the takeaway position and had decided to abandon her job.[9] Kozmits never contacted Sensing to confirm his conclusion that this was her intention. Though in his deposition Kozmits could not identify the exact date upon which he reached the conclusion that Sensing had abandoned her position, he did explain Sensing's absence from work on May 6 as the result of her abandoning the job. And in July,

_____

[9] As discussed below, Sensing challenges this conclusion in light of the fact that Kozmits had said that he would contact Sensing, not the reverse, and also the fact of Sensing's numerous contacts with Kozmits between April 28 and May 5, in which she made clear that she was not abandoning her job.

-9-

when Sensing's acquaintance contacted Kozmits to inquire about Sensing's employment status under the guise of requesting a reference, Kozmits stated that Sensing was ineligible for rehire, which, as he explained in his deposition, was due to his belief that Sensing abandoned her job.  In July 2005 Outback removed Sensing from its list of active employees.  It is undisputed that Kozmits never called Sensing back about the IME.

In her deposition, Sensing stated that while she made no further personal contact with Outback after May 5, her attorney sent a letter to Outback on her behalf on May 27 which requested that she be returned to work.  In discovery, Sensing certified that the letter was sent.[10]

---

[10]  In the letter, Sensing's attorney writes:

> [B]ecause [Ms.] Sensing had not been allowed to return to her full duties, she has been forced to apply for her unemployment benefits. However her desire is the same as it has been since April 2005, and that is that she wants to return to her job as Take Away performing all her shifts and duties.

The letter threatens suit if Sensing is not returned to work immediately.

It is unclear, however, whether we may properly consider the text of the letter in evaluating Sensing's appeal. "In reviewing a summary judgment, we are limited to the . . . evidence available to the [district] court at the time the motion was made." Hoffman v. Applicators Sales And Service, Inc., 439 F.3d 9, 14  (1st Cir. 2006) (quoting Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003)).  Although a copy of this letter, filed April 2, 2008, was part of the district court record at the time that summary judgment was entered, the letter was not annexed to either party's summary judgment-related pleadings.  Rather, it appears only as an exhibit

-10-

Since May 2005, Sensing has held two jobs: one at a Subway sandwich shop, and one at an arts and crafts store named Paint the Rainbow. She states that she is capable of full-time work, but due to childcare works only part time.

## B. Procedural History

On August 8, 2005, Ms. Sensing filed a handicap discrimination charge with the Massachusetts Commission Against Discrimination ("MCAD") alleging handicap discrimination in violation of Mass. Gen. Laws ch. 151B, § 4(16). She alleged that she is a qualified handicapped person who was demoted, terminated or constructively terminated by the appellees from her takeaway position because of her status as a person with MS, or, alternatively, because she was regarded as handicapped by her employer. She also alleged that appellees failed to reasonably accommodate her handicap.

Sensing later removed the matter to Massachusetts Superior Court pursuant to § 9 of Mass. Gen. Laws ch. 151B, where,

---

attached to Sensing's "Motion for Sanctions on Account of Defendant's Spoilation of Evidence." Nor is it apparent whether the letter was properly authenticated as required by Fed. R. Civ. P. 56(e). As such, it is unclear whether the letter itself was part of the "summary judgment record" before the district court.

Nevertheless, we need not decide this question because the mailing of the letter is described in both Sensing's Answers to Interrogatories and in her deposition testimony. This evidence, which we must read in the light most favorable to Sensing, is properly part of the summary judgment record. Thus, we rely on the May 27 letter as it is described in the deposition and interrogatories.

in addition to disability discrimination, she also alleged defamation and breach of contract. Appellees eventually removed the case, on diversity grounds, to the United States District Court for the District of Massachusetts. 28 U.S.C. §§ 1332(a), 1446. Following discovery, appellees moved for summary judgment, which, on May 27, 2008, the district court granted as to all counts. Sensing v. Outback Steakhouse of Fla., Inc., 566 F. Supp. 2d 24 (D. Mass. 2008). Plaintiff appeals the grant of summary judgment as to her discrimination claim only.

## II. Discussion

### A. Standard of Review

This court's review of the district court's grant of summary judgment "is de novo and not deferential." Ricci v. Alternative Energy Inc., 211 F.3d 157, 163 (1st Cir. 2000). Summary judgment is only appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Carroll v. Xerox Corp., 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't.

-12-

of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)); see also Celotex Corp., 477 U.S. at 322 (holding that in summary judgment proceeding, movant may prevail by averring that nonmoving party cannot establish an element essential to her case). "Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial." Carroll, 294 F.3d at 236. "At this stage, the nonmoving party 'may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which he would bear the ultimate burden of proof at trial.'" DeNovellis, 124 F.3d at 306 (quoting Anderson, 477 U.S. at 256). "'[N]either conclusory allegations [nor] improbable inferences' are sufficient to defeat summary judgment." Carroll, 294 F.3d at 236-37 (quoting J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1251 (1st Cir. 1996)). "The test is whether, as to

-13-

each essential element, there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" DeNovellis, 124 F.3d at 306 (quoting Anderson, 477 U.S. at 249-50).

"In reviewing a grant of summary judgment, this court 'constru[es] the record in the light most favorable to the nonmovant and resolv[es] all reasonable inferences in the party's favor.'" Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (quoting Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002)). Thus, "to survive summary judgment a plaintiff is not required to rely only on uncontradicted evidence." Calero-Cerezo, 355 F.3d at 19 (1st Cir. 2004) (emphasis in original). Where the record contains inconsistencies "that favor in some lights the defendants and in others the plaintiff," as long as the "plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." Id.

## B. Applicable Law

Sensing's claim is brought under Massachusetts General Laws ch. 151B, § 4(16), which prohibits discrimination in employment against qualified persons with a disability. The provision states in pertinent part:

> It shall be an unlawful practice . . . [f]or any employer . . . to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against,

-14-

because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required . . . would impose an undue hardship to the employer's business.

Mass. Gen. Laws ch. 151B, § 4(16) ("Chapter 151B"). A "qualified handicapped person" means "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap." Mass. Gen. Laws. ch. 151B, § 1(16). The term "handicap" means "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment." Mass. Gen. Laws. ch. 151B, § 1(17). Pursuant to Chapter 151B, MCAD has published guidelines to "effectuate the purposes" of the statute. See Mass. Gen. Laws ch. 151B, § 2.[11] "The guidelines represent the MCAD's interpretation of [Chapter] 151B, and are entitled to substantial deference, even though they do not carry the force of law." Mass. Bay Transp. Auth. v. Mass. Comm'n Against Discrimination, 879 N.E.2d 36, 49 n.17 (Mass. 2008) (internal quotation marks omitted).

---

[11] See Guidelines: Employment Discrimination of [sic] the Basis of Handicap, available at http://www.mass.gov/mcad/disability1a.html (hereinafter, "MCAD Guidelines").

Notably, Chapter 151B is considered the "Massachusetts analogue" to the federal Americans with Disabilities Act ("ADA"). Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C., 258 F.3d 30, 32 & n.1 (1st Cir. 2001) (applying the same analysis to evaluate discrimination claims brought under both Chapter 151B and the ADA). The definitions of "disability" under the ADA and "handicap" under Chapter 151B, for example, are "virtually identical." Compare 42 U.S.C. § 12102(1) with Mass. Gen. Laws ch. 151B, § 1(17); see also Carroll, 294 F.3d at 238 n.3; Whitney, 258 F.3d at 32 n.1. As a result, "'[t]he Supreme Judicial Court of Massachusetts [("SJC")] has indicated that federal case law construing the ADA should be followed in interpreting the Massachusetts disability law.'" Whitney, 258 F.3d at 32 n.1 (quoting Ward v. Mass. Health Research Inst., 209 F.3d 29, 33 n.2 (1st Cir. 2000)); see also Carroll, 294 F.3d at 238 n.3 (noting that "the state has looked to federal case law to assist in interpreting its statute"); Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d 1054, 1062 n.6 (Mass. 2002) (explaining that the SJC "look[s] to the Federal cases decided under the ADA as a guide to the interpretation of [Chapter] 151B); Labonte v. Hutchins & Wheeler, 678 N.E.2d 853, 856 n.5 (Mass. 1997) (noting that because Massachusetts employee discrimination law "closely mirror[s] the [ADA]" the SJC "look[s] toward Federal courts to see how they have addressed [the] issue"); Wheatley v. Am. Tel. & Tel. Co., 636

-16-

N.E.2d 265, 268 (Mass. 1994).[12] Case law under other federal anti-discrimination statutes, such as the Rehabilitation Act, has also been regarded as instructive. See Cox v. New England Tel. & Tel. Co., 607 N.E.2d 1035, 1040-41 (Mass. 1993) (explaining, in discussing the Rehabilitation Act, that "[b]ecause of the similarity between the Federal and State statutes, the Federal cases are most helpful in the resolution of cases involving G.L. c. 151B, which prohibits employment discrimination against qualified handicapped persons").

Furthermore, in applying Chapter 151B to employment discrimination claims, the Supreme Judicial Court of Massachusetts uses a burden-shifting framework along the lines of McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). See Matthews v. Ocean Spray Cranberries, Inc., 686 N.E.2d 1303, 1308-09 (Mass. 1997); see also Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005). Under that framework, Sensing must first make a prima facie case of disability discrimination, see McDonnell-Douglas, 411 U.S. at 802, by establishing "(1) that [she] suffers from a disability or handicap"; (2) that "[she] was nevertheless able to perform the essential functions of [her] job, either with or without reasonable accommodation," and (3) that her

[12] Although there are differences between the two statutes and amidst the precedent interpreting them, see, e.g., Whitney, 258 F.3d at 32 n.1 (examining differences with respect to treatment of "mitigating or corrective devices"), these differences are irrelevant here.

-17-

employer "took an adverse employment action against [her] because of, in whole or in part, [her] protected disability." Carroll, 294 F.3d at 237.  If Sensing establishes her prima facie case, "the burden then shifts to [defendants] to articulate a legitimate, non-discriminatory reason for [their] employment decision and to produce credible evidence to show that the reason advanced was the real reason."  Tobin, 433 F.3d at 105 (citing McDonnell-Douglas, 411 U.S. at 802).  Finally, if defendants offer such a legitimate reason, the burden shifts back to the plaintiff to produce evidence "to establish that [defendants'] non-discriminatory justification is mere pretext, cloaking discriminatory animus."  Id. (citing McDonnell-Douglas, 411 U.S. at 804).

The parties disagree as to whether Sensing has established a prima facie case.  We begin our analysis there.

### C.  **Prima Facie Case**

Appellees argue that Sensing cannot prove the first or third elements of her prima facie case.  We consider each element in turn.

#### 1.  **"Handicapped"**

Although the district court did not reach this issue, appellees argue that we can affirm summary judgment on the independent ground that Sensing cannot establish she suffers from

a "handicap" within the meaning of Chapter 151B.[13] Not all physical or mental impairments constitute a "handicap" under the Massachusetts anti-discrimination statute, but rather, as noted above, § 1(17)(a) defines "handicap" as "a physical or mental impairment which substantially limits one or more major life activities." See Mass. Gen. Laws ch. 151B, § 1(17)(a). Appellees emphasize that a medical diagnosis, without more, is insufficient to establish a handicap under Chapter 151B; rather, "'the extent of the limitation . . . in terms of [the plaintiff's] own experience'" is determinative. City of New Bedford v. Mass. Comm'n Against Discrimination, 799 N.E.2d 578, 589 (Mass. 2003) (quoting Carroll, 294 F.3d at 238). Appellees argue that Sensing essentially conceded in her deposition testimony that her MS condition did not substantially "limit one or more [of her] major life activities," by stating that with the exception of her one major flare-up, her MS had not restricted her in any meaningful way. Thus, appellees argue that Sensing has effectively forfeited the claim that she is "handicapped" within the meaning of the statute.

We note that Sensing's position that she was only limited in major life activities during the "flare-up" periods of her episodic MS condition is not inconsistent with being "handicapped"

---

[13] "We may affirm the district court's decision on any grounds supported by the record." Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008) (quoting Estades-Negroni v. Assocs. Corp. of N. Am., 377 F.3d 58, 62 (1st Cir. 2004)).

-19-

within the meaning of Chapter 151B.  See Cargill v. Harvard Univ., 804 N.E.2d 377, 380 & n.3 (Mass. App. Ct. 2004)  (finding no dispute as to whether plaintiff with rheumatoid arthritis was "handicapped" within meaning of Chapter 151B although pain was "intermittent" and "periods of remission or stabilization" did occur).[14]  Nonetheless, we need not decide this issue.  Whether or not Sensing can establish that she is actually "handicapped" within the meaning of § 1(17)(a), Sensing argues, and we agree, that she may separately be found "handicapped" under § 1(17)(c) on account of being "regarded [by her employer] as having such impairment."

To satisfy the first prong on the basis of being regarded-as-disabled, Sensing must produce evidence that Outback/Kozmits "regarded [her] as having an impairment which [she] did not have, or mistakenly perceived that a non-limiting impairment substantially limited [her] in a major life activity." Carroll, 294 F.3d at 238 n.4; see also Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521-22 (1999) ("[A] person is 'regarded

---

[14] Analogous federal law, which the SJC regards as instructive, see supra section II.B., similarly provides that an episodic condition may nevertheless constitute a disability.  See 42 U.S.C. § 12102 (4)(D) ("The [ADA's] definition of 'disability' . . . shall be construed in accordance with the following: . . . An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."); Bragdon v. Abbott, 524 U.S. 624, 635-36 (1998) (holding that HIV infected plaintiff was "disabled" under the ADA even during the "asymptomatic" stage of the disease); School Bd. of Nassau County v. Arline, 480 U.S. 273, 281 (1987) (holding that teacher with long dormant disease of tuberculosis that had recently reoccurred was "handicapped" within meaning of Rehabilitation Act).

-20-

as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities."). Drawing all reasonable inferences in Sensing's favor, we conclude that Sensing has a reasonable expectation of proving that she was "regarded-as" handicapped.

Based on the evidence in the summary judgment record, it would be reasonable to infer that Kozmits perceived Sensing as "handicapped," i.e., as suffering from a "physical impairment" that "substantially limited" her in a major life activity. See City of New Bedford, 799 N.E.2d at 509. MS undoubtedly constitutes an "impairment." See MCAD Guidelines II(A)(2) (defining "impairment," inter alia, as a "disorder affecting one or more of a number of body systems"); Labonte, 678 N.E.2d at 859-60 (affirming liability in favor of plaintiff with MS on her claim under 151B that she was terminated because of her "handicap"); 28 C.F.R. § 41.31(b)(1) (including MS in representative list of disorders and conditions constituting "physical impairments" for purposes of the ADA).[15] It is undisputed that, at least by late fall 2004, Kozmits was aware of Sensing's diagnosis. Moreover,

---

[15] As explained, supra section II.B., the definition of "handicap" under Chapter 151B and "disability" under the ADA are virtually identical, and the SJC regularly applies ADA precedent to the interpretation of cases under the Massachusetts statute. See, e.g., Russell, 772 N.E.2d at 1062 n.6; Labonte, 678 N.E.2d at 855 n.5. Following the SJC's example, we do the same.

Chapter 151B defines the term "major life activities" as including such functions as "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." Mass. Gen. Laws ch. 151B, § 1(20). Here, appellees include in the record affidavits from Sensing's coworkers, who express concern about Sensing's ability to perform her job quickly and safely, concerns which they allegedly brought to Kozmits' attention. The record also contains evidence that Kozmits was concerned about Sensing "falling" on the job as a result of her MS condition, a concern that he expressly articulated to Sensing as his reason for not allowing Sensing to return to work in the takeaway position. From the fact that Kozmits questioned Sensing's ability to perform her job without "falling," it is reasonable to infer that Kozmits doubted not only Sensing's ability to work in her particular job, but also her ability to work in a broad class of jobs that would have required her to be on her feet. See Gelabert-Ladenheim v. American Airlines, Inc., 252 F.3d 54, 60 (1st Cir. 2001) (describing requirement that a plaintiff must show "significant restriction as to either a class of jobs or a broad range of jobs in various classes," and not impairment as to a single, specific job to establish impairment in major life activity of working). Moreover, these concerns suggest that Kozmits doubted Sensing's ability to carry out other "major life activities," besides working, such as "walking" and "performing manual tasks."

-22-

See Mass. Gen. Laws ch. 151B, § 1(20). On these facts, there is sufficient evidence that Kozmits regarded Sensing as suffering from an impairment that substantially limited major life activities. Thus, a jury could reasonably conclude that Sensing satisfied the first element of her prima facie discrimination claim.

## 2. Otherwise Qualified

Although not conceding the issue, appellees do not contend that Sensing failed to make out a triable issue of material fact as to the second prong of the prima facie case of disability discrimination. We agree that Sensing has raised a genuine issue as to whether she was "able to perform the essential functions of [her] job, either with or without reasonable accommodation." Carroll, 294 F.3d at 237. An "essential function is a 'fundamental job dut[y] of the employment position the individual with a disability holds or desires.'" Ward, 209 F.3d at 34 (alteration in original)(quoting Laurin v. Providence Hosp., 150 F.3d 52, 56-57 (1st Cir. 1998)).

Sensing has proffered sufficient evidence to permit a jury to find that despite her "handicap," she was nevertheless able to perform the "essential functions" of the takeaway job, at least with reasonable accommodation. Such evidence includes three doctor's notes from Sensing's physicians stating that she could return to the takeaway position, the latter two indicating that she could do so without restriction. Also, Sensing's deposition

-23-

testimony indicates that she adequately performed the essential functions of the takeaway position for a year following her MS diagnosis and for the ten weeks following her first major "flare-up" with only minor, unobjected-to accommodations. Appellees have certainly put forth conflicting evidence, including affidavits from Sensing's Outback co-workers, that call into question Sensing's ability to perform the essential functions of the takeaway job adequately and safely, particularly in the months following her major flare-up. Nevertheless, crediting Sensing's account, as we must on summary judgment, we hold that Sensing's evidence is sufficiently strong to support a verdict in her favor, precluding the entry of summary judgment against her.

### 3. Adverse Employment Action

In order to establish the final prong of her prima facie case, Sensing must show that she suffered an "adverse employment action" as a result of her handicap. Tobin, 433 F.3d at 104. It was on the basis of this element that the district court granted summary judgment, concluding that Sensing had "not produced evidence sufficient to make triable an essential element of her claim of handicap discrimination, namely, that she was constructively discharged." Sensing, 566 F. Supp. 2d at 27. Discharge, however, constructive or otherwise, is not the only "adverse employment action" that can satisfy this element, nor the only one alleged by Sensing. Rather, an adverse employment action,

-24-

for purposes of Chapter 151B has been broadly defined to include any material "disadvantage[] in respect to salary, grade, or other objective terms and conditions of employment."  MacCormack v. Boston Edison Co., 672 N.E.2d 1, 8 (Mass. 1996).[16]  With respect to a reasonable accommodation claim, the third prong of the prima facie case can be satisfied by a showing that the employer "despite knowing of [the employee's] alleged disability, did not reasonably accommodate it."  Carroll, 294 F.3d at 237.

Sensing has put forth three alternative claims that could, if substantiated, support a finding of an adverse employment action.  First, she argues that appellees actually or constructively discharged her because of her status as a person with MS by removing her from their work schedule and making it impossible for her to comply with the condition it imposed for restoration to work.  Second, she argues that even absent a finding of discharge, appellees' actions nevertheless amounted to discriminatory adverse employment actions within the meaning of the

_____

[16]  See also Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005) (holding that adverse employment effects include, but are not limited to, such discrete actions as discharge, demotion, or reduction in pay); Blackie v. State of Me., 75 F.3d 716, 725 (1st Cir. 1996) (noting in context of FLSA case that to constitute adverse employment action, "the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, . . . or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service." (internal citations omitted)).

statute. Third, Sensing argues that the appellees' failure to accommodate her disability constituted an adverse employment action.

Only the first of these theories was directly addressed in the district court's opinion. However, appellees are not entitled to summary judgment on this issue if a reasonable jury could conclude, based on the facts in the record construed in the light most favorable to Sensing, that Sensing could satisfy the third prong under any one of these theories. We hold that a jury could so find under either of the first two theories, and thus, the district court erred in holding that Sensing failed to make out a prima facie case.

### a. Discharge

Sensing contends that the evidence on the summary judgment record is sufficient to establish that she was actually discharged from her takeaway position at Outback. Although she does not allege that she was formally terminated from her position, she claims that Outback "effectively ended her employment" when it removed her from the work schedule and rejected her multiple requests to return to work. Sensing made clear that she was willing to comply with Outback's condition that she undergo an IME, and it was Outback's actions in failing to contact her with the information she needed to undergo that exam that ensured that Sensing could never satisfy the condition and thus, would never

-26-

return to her job. It is therefore a reasonable inference, sufficient to sustain a jury finding, Sensing argues, that these actions amounted to a "dismiss[al] from employment . . . because of [her] handicap." Mass. Gen. Laws ch. 151B, § 4(16). Outback, in turn, argues that the undisputed evidence shows that it was Sensing who chose to abandon her job in favor of collecting unemployment and pursuing a lawsuit when it reasonably requested that she submit to an IME and offered her interim "light duty" work.

Although the issue of whether an employee has suffered an adverse employment action such as a termination is usually straightforward, sometimes the evidence is unclear and the question must be submitted to the jury. For example, in MacGregor v. Mallinckrodt, Inc., the plaintiff, MacGregor, was passed over for promotion and rejected her employer's offer of an alternate position, which MacGregor concluded was not suitable. See 373 F.3d 923, 926 (8th Cir. 2004) (Title VII gender discrimination case). After MacGregor communicated her rejection of the alternative position, her supervisor distributed a memo to company employees stating that MacGregor was leaving the company. Id. The court noted that "the employee's rejection of the new job does not necessarily indicate that the employee has resigned." Id. at 928. The court concluded that "there [was] conflict over whether [the employee] quit or was fired after having received an alternative offer of employment." Id. Accordingly, the court held that "a

-27-

jury could have reasonably found that MacGregor suffered an adverse action." Id. at 929.

We find this to be a similar case where the circumstances resulting in Sensing no longer being employed by appellees are far from clear. Appellees rely on Sensing's statements, in her deposition, that it made more sense for her to apply for unemployment than to take the offer of light duty work and that she did not call Kozmits back after May 5, but instead, contacted a lawyer, as constituting undisputable evidence of job abandonment. We disagree that this conclusion is compelled by these facts.

At summary judgment, Sensing's sworn statement at deposition establishes that during her May 5th conversation with Kozmits, Sensing indicated that she was willing to undergo the requested IME, that Kozmits told Sensing that he would locate an approved physician and contact her with the information once he obtained it, and that Sensing replied that she would wait to hear from him. Although Sensing did not follow up with Kozmits directly regarding the exam, we cannot conclude that her failure to do so constitutes abandonment where Sensing was expressly instructed to await contact from Kozmits. Moreover, although Sensing did not personally contact Outback after May 5, the fact of Sensing's numerous contacts with Kozmits between April 28 and May 5, in which she made clear that she wanted to retain her takeaway position, weaken any conclusion that Sensing abandoned her job.

-28-

Nor does the fact that Sensing applied for unemployment conclusively indicate job abandonment. To qualify for unemployment benefits under Massachusetts law an individual need only show that "despite being capable of and available for work," she is not performing any "wage-earning services" during the particular weeks for which she seeks compensation. See LeBeau v. Comm'r of Dept. of Employment and Training, 664 N.E.2d 21, 23-24 (Mass. 1996) (citing Mass. Gen. Laws ch. 151A, §§ 29(a), 1(r)). Thus, the fact that Sensing applied for unemployment benefits is consistent with Sensing's version of the events -- that having been entirely cut from the work schedule against her will and being unable to afford the much lower paying alternative of "light duty" work, Sensing sought unemployment benefits to support herself during the intervening period, while she waited to hear from Kozmits regarding the information she needed to undergo the IME. Relevant to the plausibility of Sensing's version is the fact that unemployment benefits are generally unavailable in Massachusetts to one who voluntarily abandons her employment.[17] Nor does the fact that Sensing contacted a lawyer undisputedly indicate job abandonment.

_____

[17] See LeBeau, 664 N.E.2d at 25 ("Where the employee has brought unemployment on herself without good cause, there is no entitlement to unemployment benefits" (quoting Leone v. Director of the Div. of Employment Sec., 493 N.E.2d 493 (Mass. 1986)); Mass. Gen. Laws ch. 151A, § 25(e)(1) (disqualifying employee from receiving unemployment benefits if she left work "voluntarily unless the employee establishes by . . . that [s]he had good cause for leaving attributable to the employ[er]").

Suspecting, as Sensing testifies in her deposition, that Outback was "trying to push [her] out," a jury could reasonably conclude that Sensing sought legal consultation about her rights, while at the same time hoping to retain her position, should Outback allow her to do so. This possibility is underscored by the letter to this effect sent by Sensing's attorney to Outback on May 27th indicating Sensing's continued desire to be restored to the takeaway position. Yet even after receiving this letter, neither Kozmits nor anyone at Outback contacted Sensing with the information she needed to actually undergo the requested IME.

A jury may ultimately conclude that Sensing was not terminated by appellees but rather, that she abandoned her position. But we find Sensing's evidence to be sufficiently strong and cognizable for a jury to find that appellees effectively terminated Sensing by denying her the possibility of returning to work. See Calero-Cerezo, 355 F.3d at 19. In light of these disputed facts, it remains for a jury "to determine which version of the facts is most compelling." Id.[18]

---

[18] Sensing also argues that she can sustain a claim of wrongful discharge by proving that she was "constructively discharged" from her takeaway position at Outback. GTE Prods. Corp. v. Stewart, 653 N.E.2d 161, 168 (Mass. 1995). A "[c]onstructive discharge occurs when the employer's conduct effectively forces an employee to resign . . . [and when] the employment relationship is actually severed involuntarily by the employer's acts against the employee's will." Id. The inquiry for purposes of a constructive discharge claim is an objective one: "Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" Pa. State Police v. Suders,

## b. Other Adverse Employment Action

Sensing alternatively argues that even if Outback's actions in, *inter alia*, denying her requests to be restored to the work schedule are not found to amount to a "termination," a question as to which we conclude there exists a material factual dispute, Outback's conduct nevertheless amounts to other "adverse employment action," that satisfies the third prong of Carroll. We agree.

"Under G.L. c. 151B, § 4(4), adverse actions consist of a defendant's action 'to discharge [or] expel'" but also, to "'otherwise discriminate against' the plaintiff." Mole v. Univ. of Mass., 814 N.E.2d 329, 339 n. 14 (Mass. 2004). Thus, Sensing can satisfy the third element of her prima facie case by raising a genuine issue as to whether appellees "took . . . adverse employment action against [her]," other than termination. Carroll, 294 F.3d at 237. Such other adverse employment actions may include "disadvantag[ing] [her] in respect to salary, grade, or other objective terms and conditions of employment." MacCormack, 672

---

542 U.S. 129, 141 (2004).

We need not decide, however, whether a reasonable person in Sensing's position would have felt compelled to resign because Sensing denies resigning from her position at Outback. Rather, in her deposition testimony, Sensing repeatedly avers that she "did not quit" her job. Absent resignation, Sensing's constructive discharge claim must fail. See GTE Prods. Corp., 653 N.E.2d at 168-69 (describing constructive discharge as resulting when employee's resignation due to employer's conduct is regarded as termination).

N.E.2d at 8; see also Blackie, 75 F.3d at 725 (including demotion, reduction in salary and divestment of significant responsibilities as examples of adverse employment actions). Massachusetts "[c]ases have employed the phrase 'adverse employment action' to refer to the effects on working terms, conditions, or privileges that are material, and thus governed by the statute, as opposed to those effects that are trivial and so not properly the subject of a discrimination action." King v. City of Boston, 883 N.E.2d 316, 323 (Mass. App. Ct. 2008). "Determining whether an action is materially adverse necessarily requires a case-by-case inquiry." Blackie, 75 F.3d at 725.

The record establishes that appellees removed Sensing from the work schedule after she missed only one and a half covered shifts, offering her in the alternative a "light duty" position with substantially reduced salary, hours and responsibilities. These actions disadvantaged Sensing with respect to the terms and conditions of her employment, see MacCormack, 672 N.E.2d at 8, and amounted to far more than mere trivial inconveniences. See King, 883 N.E.2d at 324 (noting that "materially adverse employment action requires more than trivial, subjectively perceived inconveniences." (citations omitted)). Rather, although the demotion was intended to be temporary, in light of the fact that months went by without Sensing being scheduled for work or contacted regarding the IME that could allow her to return to work,

we hold that Sensing has adduced sufficient facts to establish that Outback's actions were nevertheless "materially adverse." Id.; Gu v. Boston Police Dept., 312 F.3d 6, 14 (1st Cir. 2002) (listing "demotions [and] disadvantageous transfers or assignments" as examples of "material changes" in working conditions); see also Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 71-73 (2006) (holding that potentially indefinite suspension of employee from work without pay could constitute materially adverse employment action, even where employer awards full backpay for the entire period, and that reassignment of responsibilities could constitute materially adverse employment action, even absent demotion).

Finally, having concluded that a reasonable jury could find that appellees terminated Sensing or otherwise committed adverse employment actions against her, we also hold that Sensing has put forth substantial evidence that these adverse actions were taken, at least in part, because of her actual or perceived handicap. See Dartt v. Browning-Ferris Indus., Inc., 691 N.E.2d 526, 530-31 (Mass. 1998). Such evidence includes Kozmits' explicitly citing his fear of liability for Outback as a result of Sensing falling at work, his statement that he was not "comfortable" with Sensing working and his instruction that Sensing tend to her medication before returning to work -- all statements

-33-

leading up to Kozmits' decision to indefinitely remove Sensing from the work schedule.[19]

Having made out sufficient evidence as to each element, we hold that Sensing has stated a prima facie claim of handicap discrimination under Chapter 151B.

### D. Non-discriminatory reason and pretext

Because we hold that Sensing has put forth sufficient evidence to establish her prima facie case, we move to the second and third steps of the McDonnell-Douglas burden-shifting framework. Under the second prong, appellees must "offer a non-discriminatory

---

[19]  Sensing alternatively argues that she can satisfy the third prong of her prima facie case by showing that Kozmits and Outback "otherwise discriminat[ed] against" her in violation of Chapter 151B, § 4(16) by failing to reasonably accommodate her handicap. See Ocean Spray Cranberries, Inc., 808 N.E.2d at 270. Relatedly, Sensing alleges that Outback failed to engage in an "interactive process" with her regarding her handicap. See Tobin, 433 F.3d at 108 n.7. These claims, however, sit awkwardly with Sensing's position that, except during flare-ups, she could perform the essential functions of her job without accommodation and with the absence of evidence on the record that Sensing requested accommodation from Outback or suggested what accommodation she might require. See Ocean Spray Cranberries, Inc., 808 N.E.2d at 267 ("[I]t is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one." (quoting Russell,772 N.E.2d at 1065)); MCAD Guidelines at VII(A) (explaining that duty to accommodate under Chapter 151B is triggered either when the handicapped employee alerts employer of her need, or else, if employer has reason to know what accommodation is required).

In any event, given our conclusion that Sensing has made out a triable issue as to actual discharge and other adverse employment action, thereby establishing a prima facie claim of handicap discrimination, we need not reach her alternative reasonable accommodation theory.

reason for the employment action in question." Che v. Mass. Bay Transp. Authority, 342 F.3d 31, 39 (1st Cir. 2003). They have. Appellees assert a legitimate interest in on-the-job safety that was furthered by removing Sensing from the work calendar and requesting that she submit to an IME. Chapter 151B itself refers to the permissibility of job qualifications consistent with the "safe" performance of the particular job.[20] And here, the affidavits from Sensing's coworkers, questioning Sensing's ability to perform her job safely, provide evidence supporting appellee's purported legitimate, nondiscriminatory reason. Moreover, the MCAD Guidelines contemplate the permissibility of medical examinations, at least in some circumstances, such as, where there is evidence of a job performance or safety problem:

> In order to comply with Federal law, post-hire medical examinations (and/or inquiries) must be job related and consistent with business necessity. For example, employers may conduct medical examinations (and/or make inquiries) concerning the ability of the employee to perform job-related functions, or where there is evidence of a job performance or safety problem.

_____

[20]    "Physical or mental job qualification requirement with respect to hiring, promotion, demotion or dismissal from employment or any other change in employment status or responsibilities shall be functionally related to the specific job or jobs for which the individual is being considered and shall be consistent with the safe and lawful performance of the job."

Mass. Gen. Laws ch. 151B, § 4(16) (emphasis added).

-35-

MCAD Guidelines V(F) (citing 29 C.F.R. § 1630.14(c) and EEOC, Technical Assistance Manual on the Employment Provisions (I) of the ADA at § 6.1 (hereinafter EEOC Manual). At least one court has held that employers may, consistent with Chapter 151B, require an employee returning from medical leave to submit to an examination to determine competency for work. See White v. City of Boston, No. Civ. A. 95-6483-F, 1997 WL 416586 (Mass. Super. July 22, 1997), aff'd by White v. City of Boston, 700 N.E.2d 526 (Mass. 1998) (151B issue not raised on appeal). Thus, Outback requiring Sensing to submit to an IME and the accompanying temporary demotion, if in fact motivated exclusively by legitimate and immediate concern about Sensing's ability to perform the takeaway job safely, would constitute a permissible non-discriminatory justification under Chapter 151B. Tobin, 433 F.3d at 106.

This brings us to the third and final McDonnell-Douglas prong under which Sensing must present evidence to rebut defendant's explanation and "show that the adverse employment action was [actually] the result of discriminatory animus." Che, 342 F.3d at 39. "Evidence that the employer's stated reasons are pretextual can be sufficient for a jury to infer discriminatory animus." Id. To pass summary judgment, Sensing must present evidence to at least create a genuine issue about this material fact. She has done so here.

A reasonable jury could find that Kozmits' removal of Sensing from the work schedule was predicated, at least in part, on impermissible discrimination, as Sensing alleges, rather than a permissible legitimate concern about her ability to perform the job safely.[21] A jury might reach this conclusion by finding, for example, that appellees had insufficient justification for removing Sensing from the work schedule for reasons of safety alone. While it is true that appellees have provided affidavits from Sensing's coworkers that call into question Sensing's ability to perform her takeaway job safely, Sensing had also been evaluated at least three times by her own physicians and provided Outback with three notes confirming their expert medical opinions that she could, in fact, perform the takeaway job. Had appellees questioned whether these physicians had an adequate basis for their opinions, they could have contacted the physicians directly, but chose not to do so. Appellees also did not require Sensing to undergo an IME after her return from a month long medical leave in November 2004, but did so on this occasion after Sensing missed only one and a half shifts. Moreover, Kozmits' stated concern that Sensing could cost the restaurant thousands of dollars of liability if she were to fall may be interpreted as speculation as to risk of future injury, a

---

[21] We reiterate that after Dartt, it is sufficient that Sensing establish that the adverse actions were motivated in part by discriminatory animus -- such animus need not be the exclusive reason for the action. See 691 N.E.2d at 530-31.

prohibited form of discrimination under the MCAD guidelines, rather than legitimate concern about Sensing's present ability to safely perform the essential functions of her job.[22]  Finally, the fact that Outback never contacted Sensing to provide her with the information necessary to actually undergo the IME, as Kozmits promised to do, coupled with Kozmits' arguably unreasonable, unverified assumption, within days of his conversation with Sensing, that Sensing was abandoning her job, raises a question as to whether appellees actually sought to allow Sensing to return to work, provided she could do so safely, or whether the articulated concerns about safety were actually pre-textual, the real reasons for her removal being discriminatory animus.

Ultimately, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (quoting Anderson, 477 U.S. at 255).  The question of whether Outback's

---

[22]  The MCAD Guidelines state that "an employer may not disqualify a handicapped individual who is currently able to perform the essential functions of the job sought, with or without reasonable accommodations, because of a speculation that the handicap may cause a risk of injury in the future." MCAD Guidelines V(B).  For this proposition the guidelines cite to the EEOC Manual on the ADA, which similarly provides that the "results of a medical . . . examination may not be used to disqualify [otherwise qualified] persons . . . because of fear or speculation that a disability may indicate a greater risk of future injury . . . or may cause future workers' compensation or insurance costs."  See EEOC Manual at § 6.4.

actions were motivated by legitimate safety concerns or alternatively, impermissible discriminatory animus is a factual dispute that could be resolved in favor of either party, thereby precluding summary judgment.

### III. **<u>Conclusion</u>**

For the foregoing reasons, we **reverse** the entry of summary judgment and **remand** for proceedings consistent with this opinion.

**<u>Reversed and Remanded</u>**.